**James Thomas JEFFERSON, Appellant,**

v.

**STATE of Tennessee, Appellee.**

Court of Criminal Appeals of Tennessee.

May 20, 1977.

Rehearing Denied June 23, 1977.

Certiorari Denied by Supreme Court Oct. 11, 1977.

Avon N. Williams, Jr., Nashville, for appellant.

Brooks, McLemore, Jr., Atty. Gen., William C. Koch, Jr., Asst. Atty. Gen., Thomas H. Shriver, Dist. Atty. Gen., Nashville, for appellee.

WALKER, Presiding Judge.

## OPINION

In *State v. Jefferson,* Tenn., 529 S.W.2d 674 (1975), a limited remand was ordered for an evidentiary hearing on the plea in abatement alleging systematic exclusion of Negroes from grand and petit juries in Davidson County and on the allegations that blacks were systematically excluded from the petit juries by the use of a computer.

After an evidentiary hearing, the trial judge (sitting by designation) filed his memorandum in which he overruled all of the appellant's contentions. We approve his findings of fact and conclusions of law and affirm the judgment of dismissal.

In disposing of Jefferson's attack on the composition and constitutionality of the grand jury, the trial judge found:

"As to the selection of the Grand Jury, the Court finds that by Chapter 53 of the

Private Acts of 1947, the Judge of the Criminal Court was the official responsible for selection of the Grand Jury; that such act has heretofore been found to be constitutional and is not a question in this hearing; that in the May, 1968, term at which the indictment was returned, the Honorable Raymond H. Leathers, Judge of Division I of the Criminal Court for Davidson County, selected the Grand Jury; that Judge Leathers had appointed Grand Jurors on a rotating basis since September, 1958, when he became Judge; that on some of those he had not appointed any black persons; that he probably did not appoint more than one black person on any particular Grand Jury prior to May of 1968; that as shown by 'Defendant Exhibit No. 8' introduced in this hearing, which is a stipulation filed in a previous case, eight black persons had served on those Grand Juries; that in selecting the Grand Jury for the May, 1968, term of the Court the Judge selected thirteen (13) persons, one of which was a black person; that subsequent to this it was necessary to select substitute jurors for this panel, and that using the list of regular jurors who had been called for Trial Jury service, two (2) other black persons were selected as substitute jurors and that one of these black persons was made a regular member of the Grand Jury on May 24, 1968; that two black persons were serving on the Grand Jury which indicted the defendant on 19 July 1968; that in selecting persons to serve on Grand Juries under the Private Act of 1947, the Judge sought people in the community who were reputable people; that the selection of black people was done so as to include some black people on the Grand Jury; that no factor was used in determining the number of black persons to select for Grand Jury service; that the same method for selecting white persons and black persons was used, that is by finding reputable people to serve on Grand Juries; that the evidence in this case does not show that the Judge selecting the Grand Jury of May, 1968, systematically excluded black persons from the Grand Jury, nor did he include black persons in such a manner as to indicate 'token inclusion' so as to render the Grand Jury an improper body."

■ In challenging the dismissal, the appellant insists that the court erred in limiting his proof to the May 1968 grand jury that indicted him. He contends that under *Castaneda v. Partida*, 430 U.S. 482, 97 S.Ct. 1272, 51 L.Ed.2d 498 (1977), he should have been permitted to show racial discrimination over a long period of time.

Although the trial judge held that the issue involved only the grand jury that indicted Jefferson, he permitted the appellant to introduce stipulations and exhibits from earlier cases that showed the statistical representation of Negroes on the grand juries in previous years. Called by the appellant, the judge who impaneled the grand jury testified that he obtained the names of prospective jurors from any source he desired; that he chose jurors through recommendations and through observing persons in the courtroom and that he picked white jurors the same way he picked black ones. In all of his selections, he was only interested in getting 12 persons who voted their consciences. He had been judge of Division I since September 1, 1958.

Based on this system, the record shows that eight blacks served on the judges' grand juries from September 1958 to May 1968, and there was usually only one black on each jury panel although some jury panels contained no blacks.

■ The plea in abatement alleged that not more than one black served on the grand jury that indicted Jefferson. On the contrary, two permanent members of that jury were black, and a black alternate was available. The percentage of blacks to the total population eligible for jury duty was 15.4, not far from the average for the county. There was no substantial underrepresentation of his group on this grand jury. With the alternate considered, at times during that term 23 percent blacks were available for the grand jury. There is no substantial disparity here which would suggest

any discriminatory purpose or that blacks had been systematically excluded from Davidson County grand juries.

Racial discrimination in the Davidson County grand jury selection process may have existed prior to 1948. See *Tollett v. Henderson,* 411 U.S. 258, 93 S.Ct. 1602, 36 L.Ed.2d 235 (1973). However, for the period of 1952 through 1971, the grand jury selection process has survived constitutional scrutiny from at least three separate courts. *Allen v. State,* unpublished, Tenn.Cr.App., February 1, 1973; *Allen v. Rose,* unpublished, D.Tenn., M.D., February 25, 1973; *Allen v. Rose,* unpublished, 6th Cir., April 30, 1974. In addition, the statute authorizing judges to select the grand jury has also been upheld. *Canady v. State,* 3 Tenn.Cr. App. 337, 461 S.W.2d 53 (1970).

Although the trial judge did not allow Jefferson the wide ranging latitude he sought, we have examined the entire record and find that he did not improperly restrict the appellant in presenting his proof. On the whole record before us, the trial judge correctly found that the selecting judge did not discriminate against blacks in the grand jury process.

We now turn to the selection procedures of the petit jury. As we have indicated, we also agree with the trial judge's memorandum on this issue.

Beginning in 1969, a computer was used to select the names of potential jurors. Information was gathered from voter registration lists and customer rolls of the Nashville Electric Service, which provided 30,000 and 5,000 names, respectively. Every seventh name on the jury list was chosen. From those 35,000 names, the computer randomly selected 20,000 which were placed in the jury box; the remaining 15,000 names were stored as a surplus.

At the time of the trial, the Davidson County voter registration lists were racially coded. In contrast, however, the computer cards and the NES list bearing the names of potential jurors had no racial identifying marks. Apparently, coded voter lists have since been discontinued permanently.

Two blacks served on the trial jury. Of the 785 jurors summoned for the case, under this challenged computer system, 751 are identifiable by race, 621 being white and 130 black. Thus, 17.31 percent of those identifiable by race were black. According to the 1970 census, blacks compose 18.26 percent of those over 18 and under 65 in Davidson County, the age group from which most jurors are now ordinarily called. Of those over 21 and under 65, the age group from which jurors at that time were essentially drawn, blacks compose 17.55 percent. Of the entire population over 21, blacks make up 17.75 percent from the 1970 census figures.

In his plea in abatement, Jefferson alleges that the 1960 census shows that approximately 44,984 adult Negroes were eligible for jury duty as compared to 197,949 white persons. By these figures 18.52 percent were black. We notice from the census report that 44,984 was the nonwhite population which included above five percent of races other than black. This would make only an insignificant reduction in the percentage. Those nonwhite over 21 and less than 65 were about the same by the 1960 census, 18.5 percent. Although there are only slight differences between the reports, the 1970 census figures may more accurately reflect the population in 1968 and 1971 when the grand and petit juries here were impaneled.

Neither the jury roll nor the venire need be a perfect mirror of the community or accurately reflect the proportionate strength of every identifiable group. *Swain v. Alabama,* 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965); *Washington v. Davis,* 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976). Not even disproportionate impact appears here. Jefferson has not met his burden of proving the *fact* of underrepresentation of Negroes. *Partida, supra.* On the other hand, the record shows a close relationship between the jurors called and the percentage of blacks in the community. It shows no reason for any disparity, and there was no substantial underrepresentation on the petit jury.

The appellant argues that a smaller percentage of blacks than whites are registered to vote in Davidson County and are on the customer rolls of the NES. He contends these are biased selection tools and should be excluded.

■ The United States Constitution does not mandate the sources for jury lists so long as they reasonably reflect a cross section of the community. *Carter v. Jury Commission of Greene County,* 396 U.S. 320, 90 S.Ct. 518, 24 L.Ed.2d 549 (1970). Voter registration lists are generally considered the most inclusive list of names for potential jurors. These lists supplemented by the NES rolls did not show invidious discrimination or discriminatory practices but, in fact, reflect the required random selection. See *Carter, supra.* Exclusive use of voter lists may have a chilling effect on the exercise of the franchise and the jury commission wisely supplemented them by the NES rolls. This resulted in a proper jury list and one which was administered without racial discrimination. Even if there had been a disproportionate impact resulting from the use of these lists, it would not in itself merit relief. *Davis, supra.*

■ Jefferson urges that the computer could be programmed to make racial identifications on the cards, that there was personal handling of the computer, and that the jury box could be tampered with to produce racial discrimination. Since the record discloses no such practices, his argument is little more than abstract speculation, which is inconsistent with the rule that such practices cannot be merely asserted, but must be proven. *Swain v. Alabama, supra.*

The evidence shows that the jury officials had no access to the coded voter registration lists nor gave any racial consideration in calling the jurors. All they had were the names from the computer printout, and these were not racially coded. In short, the computer selection methods were essentially neutral in both design and impact, with the result that Jefferson was not denied any constitutional rights.

All assignments are overruled and the judgment of the trial court is affirmed.

DWYER and TATUM, JJ., concur.

### ON PETITION TO REHEAR

In this cause a petition to rehear has been filed and considered. Upon examination, it appears that it does not conform to Rule 32 of the Supreme Court adopted by this court. No new argument has been made, and no new authority has been adduced by the appellant. No material fact has been overlooked by the court. The petition is therefore denied.

DWYER and TATUM, JJ., concur.