STATE of Tennessee, Appellee,

v.

Billy Ray IRICK, Appellant.

Supreme Court of Tennessee, at Knoxville.

Nov. 7, 1988.

Certiorari Denied March 6, 1989.

See 109 S.Ct. 1357.

Kenneth A. Miller, Spalvins, Miller & Prewitt, James H. Varner, Jr., Tipton, Eshbaugh, Simpson & Varner, Knoxville, for appellant.

W.J. Michael Cody, Atty. Gen. & Reporter, Kathy M. Principe, Asst. Atty. Gen., Nashville, William E. Dossett, Dist. Atty. Gen., David G. Dake, David C. Jennings, Asst. Dist. Attys. Gen., Knoxville, for appellee.

## OPINION

O'BRIEN, Justice.

Billy Ray Irick was indicted for common law murder, felony murder, aggravated rape by vaginal penetration and aggravated rape by anal penetration of a seven-year-old child. In a jury trial he was found guilty of first degree murder during the perpetration of a felony and two (2) counts of aggravated rape. After a sentencing hearing the jury found that defendant should be put to death by electrocution. The aggravating circumstances warranting the death penalty were: (1) The victim was less than twelve (12) years of age and the defendant was eighteen (18) years of age or older; (2) the murder was especially heinous, atrocious, or cruel in that it involved torture or depravity of mind; (3) the murder was committed for the purpose of avoiding, interfering with, or preventing a lawful arrest or prosecution of the defendant or another; and (4) the murder was committed while the defendant was engaged in committing the felony of rape. T.C.A. § 39–2–203(i)(1), (5), (6) and (7). The trial judge sentenced defendant to forty (40) years as a Range II especially aggravated offender on each charge of aggravated rape, to be served concurrently with each other and consecutively to the sentence imposed for murder.

Among the various issues raised for reversal is a multi-faceted complaint about the jury selection process. This included the charge that prospective jurors were called in other than a random selection process, because they were not called into the jury box in a sequence which counsel considered appropriate. In conjunction with other technical and expert assistance approved by the trial court the defendant was authorized to employ an expert psychologist to evaluate a questionnaire prepared for selection of the prospective jury and for related trial assistance. This expert, whose sole practice was devoted to litigation consulting, had attained a doctorate degree in experimental psychology and experimental research. Based upon the jury evaluation questionnaire he prepared a list of jurors for the selection process broken down in categories which he considered would tend to be more pro-defense or more pro-prosecution. He referred to these in his testimony as non-authoritarian or pro-authoritarian jurors respectively. In his selection process he utilized handwriting analysis of the individual jurors plus predictor variables on the questionnaires as well as specific answers given to questions posed to venire members. It was obvious from the testimony of the witness that this analysis was highly speculative and theoretical without any empirical basis. Seven of the jurors designated by the witness as "pro-defense" were members of the jury which found defendant guilty and prescribed his sentence. We have examined the record carefully. There is not the slightest evidence that the jury selection process was inappropriate or unconstitutional.

Defendant insists the trial court failed to grant legitimate challenges for cause. He also says the trial judge took an adversarial role in rehabilitating prospective jurors who indicated bias or prejudice

against the defendant or the imposition of the death penalty. This issue is entirely refuted by the record. Defendant refers specifically to (1) a venire member who initially said she did not think she could give a fair and impartial judgment because the case involved a child and a rape; (2) a father of an eight-year-old daughter who responded in the negative when asked if he felt he could be impartial on the subject of whether or not defendant should be electrocuted or sentenced to life imprisonment; (3) a person who indicated some inclination to the view that a defendant should testify or have someone testify for him; (4) one man, formerly a law enforcement officer in the military service, who responded to inquiry that he would be inclined to accept testimony of law enforcement officers and medical personnel. Each of these persons were challenged for cause. With the exception of the prospective juror who expressed some hesitancy and lack of understanding that a defendant does not have to take the stand in his own defense, the trial judge examined each of these venire persons carefully and prudently to clarify any confusion involved in the questioning by the respective attorneys. He determined that they were unbiased and open-minded, had not established any pre-formed opinion as to the guilt or innocence of the defendant and that they were otherwise properly qualified. It is the duty of the trial judge to participate in the examination of prospective jurors. The conduct of voir dire examination in a criminal prosecution is entrusted to his discretion. Tenn.R.Crim. P. 24. His actions in the conduct of voir dire examination will not be disturbed unless there is an abuse of that discretion. *State v. Jefferson*, 529 S.W.2d 674 (Tenn. 1975), appeal after remand 559 S.W.2d 649 (Tenn.Cr.App.1977). We find nothing adversarial in the manner in which the trial judge performed his duty in this respect. Moreover, the record is clear that when the trial panel was complete defendant had not exercised all of his peremptory challenges. A defendant must not only exhaust his peremptory challenges, but he must also challenge or offer to challenge any additional prospective juror in order to complain on appeal that the trial judge's error in refusing to excuse for cause rendered his jury not impartial. *Wooten v. State*, 99 Tenn. 189, 41 S.W. 813 (1897); *State v. Doelman*, 620 S.W.2d 96, 100 (Tenn.Cr. App.1981).

█ Defendant protests the action of the trial court in excusing a juror for cause who unequivocally declared he would not consider the death penalty under any circumstances. Defendant concedes that prevailing case law is contrary to the position advocated by him. In *Wainwright v. Witt*, 469 U.S. 412, 105 S.Ct. 844, 852, 83 L.Ed.2d 841 (1985) the Court clarified and reaffirmed the proper standard for determining when a prospective juror may be excluded for cause because of his or her views on capital punishment. That standard is whether the juror's views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath. The issue is without merit.

█ Defendant has made a strong argument regarding admission of statements of defendant which had not been disclosed in response to a discovery request. Tenn. R.Crim.P. 16 relates to discovery and inspection. It provides that upon request the State shall permit a defendant to inspect and copy or photograph any relevant written or recorded statements made him ... or the substance of any oral statement which the State intends to offer in evidence at the trial made by the defendant, before or after arrest, in response to interrogations by any person known to the defendant to be a law-enforcement officer. The first reference is to the testimony of Detective Mike Parker, the officer who arrested defendant. At the time of the arrest the officer was accompanied by an acquaintance of Irick's who was along for the purpose of identifying him. They found him hitchhiking along the highway. When he was apprehended the identifying witness, Darrell Easterly, became very emotional and cursed defendant violently. He had to be restrained and placed in the front seat of the police car. When Irick was placed in the back seat Easterly turned and

said, "You son of a bitch, you killed her." After some hesitation defendant responded, "I have been hiding under the bridge all day, and several police cars have gone by and I had thought about turning myself in." Objection was made to the admission of this evidence through the testimony of the police officer on the basis that the statement had not been provided in compliance with the discovery request. Secondarily, objection was voiced because the statement was made by defendant as a result of the verbal attack by Easterly on the premise that he was working with the police department in an attempt to locate him. The court ruled that the statement made by the defendant was a spontaneous declaration made after he had been properly advised of his right against self-incrimination and was not the result of police interrogation.

Another police officer, Detective Donald Wiser, testified in some considerable detail about the circumstances involved in interrogation of defendant at the police station after his arrest. Objection was made, apparently to the detail of the officer's testimony, on the basis that he had not testified about those circumstances during examination at a suppression hearing prior to trial. The trial court denied the motion but provided defense counsel with a transcript of the officer's testimony at the suppression hearing as well as a transcript of his trial testimony for the purpose of cross-examination of the officer on the next day. After the officer testified a motion to strike his testimony was made and overruled.

■ Criminal Procedure Rule 16 also provides for the inspection of results or reports of scientific tests or experiments in the possession of the State which are material to the preparation of the defense or intended for use by the State as evidence in chief at the trial. The rule excludes the discovery or inspection of reports, memoranda, or other internal State documents made by the District Attorney General or State agents or law enforcement officers in connection with the investigation or prosecution of the case. An FBI expert in hair and fiber analysis and comparison testified concerning the various hairs found at the scene of the crime and on the victim's body and clothes. Defendant was provided with the report and the results pursuant to the discovery rule. It is insisted he was also entitled to the expert's notes pertaining to the "rough results" of his examination which showed individual characteristics identified on the hair samples. The trial court held that the reports and results submitted to the defendant were all he was entitled to have. The court did allow a recess for defense counsel to talk with the witness and go over his notes.

The trial judge was eminently correct in overruling the objection and denying the motions to strike the testimony of the foregoing witnesses. As part of his ruling he commented that the court allowed the defense very liberal discovery in this case which, because of the very serious nature of the charges against defendant, exceeded that normally granted. We concur in that finding. There was no violation of the rule and the defendant received all to which he was entitled in the way of discovery.

■ Defendant contends a statement given to the police was not knowingly, intelligently and voluntarily made. He concedes that he was properly advised of his constitutional rights. He says, however, the waiver of those rights was given under emotional duress. The record shows that he agreed to talk with the police after his arrest. He was not intoxicated. He was responsive to questions asked of him. No threats or promises were made. He made a number of changes on his written statement before signing it. It was plain that he was upset and emotional, but he was coherent at all times. He relies upon the case of *State v. Howard,* 617 S.W.2d 656 (Tenn.Cr.App.1981) in support of his claim that his confession was not voluntarily given. In *Howard* the defendant was held for sixteen (16) hours before questioning. A request for counsel was not honored. In this case there was no request for counsel. Defendant was in custody for approximately two hours before making his statement. It is argued that since he had spent many hours hiding beneath a bridge before his

arrest, this was somehow akin to sixteen (16) hours of detention as in *Howard*. Defendant offers no authority for this untenable position. The totality of the circumstances is the governing criterion in determining whether a confession is voluntary. *State v. Kelly*, 603 S.W.2d 726 (Tenn.1980). If there is material evidence to support the finding of the trial judge, that determination is binding upon the appellate courts. *State v. Chandler*, 547 S.W.2d 918 (Tenn. 1977). Under the circumstances of this case the defendant's confession was freely, voluntarily and intelligently given and was properly admitted.

Defendant raises an issue concerning the testimony of Dr. Douglas Wilson who is a board certified specialist in clinical and anatomical pathology. He performed the autopsy on the body of the victim and stated his opinion as an expert with regard to the timing of certain events, particularly whether certain injuries to the victim had occurred before or after her death. Defendant argues that Dr. Wilson was not qualified as a forensic pathologist.

■ Forensic pathology is that branch of medicine dealing with diseases and disorders of the body in relation to legal principles and cases. Black's Law Dictionary, West, 5th Edition. Forensic medicine is the application of medical knowledge to the purposes of the law. It does not in any way limit the range of the testimony of an expert within the scope of his specialized training or knowledge. Dr. Wilson has an extensive education and training in the areas of clinical and anatomical pathology. He was board certified in that specialty. He was properly qualified to testify by the court. Defendant's particular objection to the testimony of Dr. Wilson was in reference to whether or not the injuries sustained by the victim, relating to vaginal and anal penetration, were incurred before or after her death on the theory that rape could only be committed on a live victim. In *State v. Brobeck*, 751 S.W.2d 828 (Tenn.1988) this Court held that the aggravated rape statute does not require a finding that the victim be alive at the moment of penetration. Defendant's argument to the contrary is to no avail.

■ Defendant objected at trial to the admission into evidence of some 8 × 10 copies enlarged from 3 × 5 photographs. He says here that the admission of this evidence was an abuse of discretion on the part of the trial judge. The basis for this assertion appears to be that he was prejudiced by the size of the photographs as opposed to the material which they portrayed. The photographs, as enlarged, facilitated their examination by the court and the jury. The photographs were relevant to the State's case and the enlargement did not add to their prejudice. There was no abuse of discretion on the part of the trial judge in their admission. See *State v. Melson*, 638 S.W.2d 342, 364 (Tenn.1982).

■ A preliminary motion filed by the defendant requested he be allowed to introduce as evidence the results of a polygraph test administered to the victim's step-father, Kenneth Jeffers, and also expert testimony regarding the reliability of polygraph examinations. The test results indicated that Jeffers "was showing deception to relevant question" when asked if he did anything physically to cause the death of the child. The motion was overruled. Defendant concedes that no case law exists which would permit the introduction of results of the polygraph examination as evidence. The step-father of the child was at work when the victim was sexually assaulted and killed. He was called at his place of employment by the defendant after the assault occurred. Defendant argues that the refusal of the court to permit questioning about the polygraph test prevented fully testing the reliability of Jeffers as a witness for the State because it left the impression that his only basis for testifying was his concern for the victim. Further argument is made that the admissibility of such evidence is somehow different because it involves a State witness rather than a defense witness. The cases discussing the inadmissibility of polygraph test results make no distinction in this regard. The issue is without merit.

Defendant charges error of constitutional dimensions in reference to the trial judge's instructions to the jury on the indictment count for felony murder. The indictment charged in the first count that defendant unlawfully, maliciously, feloniously, willfully and deliberately killed and murdered the victim, during the perpetration of a rape; ... The second count charged common law murder in the words of the statute in that defendant did unlawfully, feloniously, willfully, deliberately, premeditatedly and with malice aforethought kill and murder the victim. In reference to the first count of the indictment a request was made that the specific elements addressed in the indictment, willfulness, deliberation and malice be included in the jury instructions. The trial court declined to use those words in his instructions to the jury because they were not necessary elements of the offense under the law in this State. Defendant argues that since the grand jury included those words as elements in the charged offense the petit jury should be instructed in the exact words of the indictment. He says the failure to do so amounted to an impermissible amendment of the indictment. We think not. In the first instance, the Legislature has established the offense of murder in T.C.A. § 39-2-201. It is also a legislative function to define first degree murder which they have done in T.C.A. § 39-2-202. The grand jury is not responsible for the enactment of the statute, or for the preparation or drafting of the indictment. An indictment is a formal written accusation charging one or more persons with a crime, drawn up and submitted to a grand jury by the public prosecuting attorney, investigated and adopted by that body, and presented upon oath by them to the court, and no bill of indictment may be sent to the grand jury without the sanction of the Attorney General approved by his signature on some part of the indictment. *Crumley v. State*, 180 Tenn. 303, 174 S.W.2d 572 (1943). Neither the inclusion by the Attorney General of the words objected to in the first count of the indictment, nor their adoption by the grand jury make them necessary elements of the offense. Defendant recognizes this fact in his argument. He says, "the use of the conjunctive, *or*, between the types of first degree murder clearly indicates a difference in the statutory definition and further indicates that the elements in the first description are not statutorily in the second description." The law is clear in such cases and is specifically spelled out in *Farmer v. State*, 201 Tenn. 107, 296 S.W. 2d 879, 883 (1956):

"Adverting to the indictment, which is copied in this opinion, it appears that the first count is in conformity with Code Section 39-2401, T.C.A., [T.C.A. § 39-2-201] which is declaratory of the common law. The second count is drawn in strict conformity with Code Section 39-2402, T.C.A. [T.C.A. § 39-2-202]. At common law there was but one kind of murder. The foregoing section of the Code, 39-2402, has divided and defined murder in two kinds. *Riddle v. State*, 50 Tenn. 401."

"*Effective statute on common-law rules.*—No new offenses are created by statutes with relation to murder in the perpetration of, or attempt to perpetrate, a felony or named felonies; the common-law offense remains the same, having been divided into degrees only. They only prescribe a severer punishment when murder is committed in the attempt to perpetrate a felony, on account of the enormity of the offense and fix absolutely the degree of the offense, usually as murder in the first degree." Wharton on Homicide, 3rd Ed., Section 118.

"When it appears, as in the instant case, that the accused was tried, and convicted under Section 39-2402 of the Code, that is, that he committed murder while perpetrating the crime of arson, it is not necessary that the State prove an intention to kill, or that it was committed willfully, deliberately, premeditatedly and with malice aforethought. The statute supplies the elements necessary to a conviction of murder in the first degree. In other words, 'the premeditated intent to commit a felony or other criminal act is, by implication of law, transferred

from that offense to the homicide actually committed, so as to make the latter offense a killing with malice aforethought constituting murder in the first degree.' ... (Citations omitted)."

To render a killing murder in the first degree under statutes making it murder in the first degree to kill in the perpetration of a felony, or specified felonies, it must have been done in pursuance of the unlawful act, and not collateral to it. In other words, 'the killing must have had an intimate relation and close connection with the felony ... and not be separate, distinct and independent from it; ...' " (Citation omitted).

The trial court did not commit reversible error and there certainly was not a constitutional violation.

■ Defendant's contention that he was denied the right to compulsory process is based on his insistence that he was entitled to call the Knox County District Attorney General as a witness to provide statistics to show he had never asked for the death penalty from a jury if the victim was black. His intent was to establish that the District Attorney General had discriminated against him because his alleged victim was white. He relies principally on the recent United States Supreme Court case of *McCleskey v. Kemp*, 481 U.S. 279, 107 S.Ct. 1756, 95 L.Ed.2d 262 (1987). Through the testimony of a State paid investigator the defense introduced a statistical compilation of all of the homicide cases reported in Knox County from 1978 through 1986 including vehicular homicide cases, second degree murder cases and lesser degrees of homicide. The trial court denied the motion because defendant had failed to raise a claim of racial discrimination in his particular case.

The *McCleskey* case involved a statistical study based on the race of both defendants and victims purporting to show a disparity in the imposition of death sentences in the State of Georgia. The study was extremely comprehensive, including statistics on over 2,000 murder cases occurring over a period of several years. The thrust of the decision in *McCleskey* was that the statistical study tending to show that racial considerations entered into capital sentencing decisions did not establish a denial of equal protection. A defendant must show either that the decision maker in his case or the legislature in enacting the death penalty statutes acted with a discriminatory purpose. The court specifically said that a defendant who alleges an equal protection violation has a burden of proving the existence of purposeful discrimination. A corollary to this principle is that a criminal defendant must prove that the purposeful discrimination had a discriminatory effect on him. Thus, to prevail under the Equal Protection Clause, a defendant must prove that the decision makers in his case acted with discriminatory purpose. See *McCleskey*, 107 S.Ct. at p. 1766. Defendant has utterly failed to meet that standard in reference to this issue. There is no merit to his complaint.

Defendant raises an issue pertaining to the closing argument of the State's counsel at the sentencing stage of the proceedings. Before the sentencing hearing began defense counsel requested that the State not be allowed to go into the issue of deterrence. The trial court ruled that the State would be allowed to respond to arguments by the defense and held a further decision in abeyance subject to future objection. While arguing in rebuttal for the death sentence State's counsel commented, "we, also, look at that defendant, not only to see if the punishment matches the crime, but to determine to what extent are we willing to risk that he will do it, again? How many more people will we risk to Billy Ray Irick under any circumstances?" An objection was made and, after an off the record bench conference which was not transcribed, the Attorney General continued, "know this, ladies and gentlemen, if you give out the death sentence and it is carried out, you will never bear any risk from Billy Ray Irick. Not one other seven-year-old child will ever be at risk of him—not one.... We not only consider—does the punishment meet the crime, and can we tolerate what this man did and the risk of further damage?" He further remarked,

"but what about other people? Because, with your verdict, you make a statement about things whether you realize it or not. You will make a statement about the value of life. You will make a statement about what this man did in your willingness to tolerate it. You will make a statement to everybody else out there what is going to happen to people who do this sort of thing. Some of you may believe that punishment is a deterrence. Some of you may not. I don't know. I personally believe that it is. I will tell you why, and this is not an original thought. But I have heard this comment made, and I guess it all depends on how you are turned—how you look at the world. Someone said that the death penalty is, sort of, like a lighthouse. You don't know how many ships have been saved by its beacon. You can't count that. You only know the ones that disregard its warning. Those, you count. Those are the Billy Ray Iricks."

After the jury had retired to consider their verdict a further objection was made to the State's argument. Defense counsel based his objection on the fact that deterrence was not an aggravating circumstance. That to allow the Attorney General to argue to the jury that the death penalty would prevent defendant from committing a similar offense implied that a life sentence would not be imposed or carried out. The trial judge responded that it was his custom to allow wide latitude in argument, both for the defense and for the State. He expressed the opinion that the District Attorney's general reference to deterrence was proper. He did not feel the argument was so inflammatory or improper as to warrant a mistrial.

We have not been directed to any case, nor does the Court know of one, specifically prohibiting argument on the issue of deterrence in a capital case. Defendant's argument to the contrary, citing *State v. Johnson*, 632 S.W.2d 542 (Tenn.1982), is misplaced. In *Johnson* the defendant raised an issue of the trial court's exclusion of testimony of two expert witnesses on the validity of the death penalty as a deterrent to crime, the moral and ethical standards of conduct of western civilization,

and the relationship between youth and accountability for decision making. The experts were to testify on these issues generally, since neither of them had ever seen or spoken with the appellant or had reviewed his record. After a discussion of the various provisions of T.C.A. § 39–2–203, the Capital Sentencing Statute, this Court held that the evidence tendered by the appellant and excluded by the trial court was not relevant to, nor did it have any probative value on the issue of punishment, but consisted of matters properly to be considered by the Legislature in deciding whether the death penalty is ever a justified punishment for a person convicted of murder in the first degree and, if so, the circumstances under which the death penalty should be imposed.

There are surprisingly few cases in our jurisprudence in which the issue is raised in the context under consideration here and none of very recent vintage. Most of these refer back to *Wooten v. State*, 203 Tenn. 473, 314 S.W.2d 1 (1958), in which Justice Swepston said in reference to an assignment assailing the attorney general's comments on deterrence to others, "So long as the attorney general does not indicate that he bases his opinion on something not appearing in the evidence, we see nothing wrong with those statements." See *Jenkins v. State*, 509 S.W.2d 240, 249 (Tenn. Cr.App.1974); *State v. Dakin*, 614 S.W.2d 812, 814 (Tenn.Cr.App.1981).

In *Darden v. Wainwright*, 477 U.S. 168, 106 S.Ct. 2464, 2471, 91 L.Ed.2d 144 (1986) in ruling on highly vituperative prosecutorial argument the Court said, "that argument deserves the condemnation it has received from every court to review it, although no court has held that the argument rendered the trial unfair." There was a reference to deterrence in the argument with the comment, "that the death penalty would be the only guarantee against a future similar act." The Court said at p. 2473 n. 15, 106 S.Ct.

"We do not decide the claim of prosecutorial misconduct on the ground that it was harmless error. In our view of the case, that issue is not presented. Rather, we

agree with the holding of every court that has addressed the issue, that the prosecutorial argument, in the context of the facts and circumstances of this case, did not render respondent's trial unfair— *i.e.*, that it was not constitutional error."

*Darden* was decided in the framework of the guilt-innocent stage of the proceedings. However, the issue was raised on the premise that the argument rendered his conviction fundamentally unfair and deprived the *sentencing determination* of the reliability that the Eighth Amendment requires. (Emphasis supplied).

In *Cozzolino v. State*, 584 S.W.2d 765, 767 (Tenn.1979), this Court spoke emphatically on the nature and extent of the evidence which is admissible at a sentencing hearing under the provisions of T.C.A. § 39–2–203(c):

"... On its face section (c) would seem to permit the introduction of evidence 'relevant to the punishment' in addition to that 'tending to establish or rebut the aggravating circumstances' or 'tending to establish or rebut any mitigating factors.' However, this interpretation is one that we cannot accept. When the statute is considered as a whole, it is clear that the only issues that the jury may properly consider in reaching a decision on the sentence to be imposed are whether the State has established one or more of the aggravating circumstances beyond a reasonable doubt and, if so, whether any mitigating factors have been shown that would outweigh those aggravating circumstances. Any evidence that does not go to the proof of one or the other of those issues is irrelevant to the jury's deliberation. We cannot believe that the legislature intended that irrelevant evidence be placed before the jury, fraught as such a procedure would be with the 'substantial risk that [the death penalty] would be inflicted in an arbitrary or capricious manner,' *Gregg v. Georgia*, 428 U.S. 153, 188, 96 S.Ct. 2909, 2932, 49 L.Ed.2d 859 (1976), i.e., on the basis of factors other than those deemed by the legislature to be proper predicates for the sentencing determination. We think that a better in-

terpretation of T.C.A. § 39–2404(c) [T.C.A. § 39–2–203(c)] and one more in keeping with both the sense of the entire statute and the mandate of the United States Supreme Court, see e.g., *Gregg v. Georgia*, supra; *Lockett v. Ohio*, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978), is that evidence is relevant to the punishment, and thus admissible, only if it is relevant to an aggravating circumstance, or to a mitigating factor raised by the defendant."

 Unquestionably, any argument based on general deterrence to others has no application to either aggravating or mitigating circumstances. Argument of this nature is inappropriate at a sentencing hearing. Deterrence of the defendant at trial by imposition of the death penalty is obvious and it would seem, redundant. Debatably, at least that part of the State's argument directed specifically toward deterrence of the defendant, was made in rebuttal to argument by defense counsel. The thrust of the defense argument was the suitability of a life sentence over execution of the defendant under the circumstances of the case. A court reviewing the propriety of argument in a capital sentencing proceeding must determine whether the prosecutor's comments affected the sentencing decision. If the Court cannot say the comments had no effect on the sentencing, then the jury's decision does not meet the standard of reliability required by the Eighth Amendment. *Caldwell v. Mississippi*, 472 U.S. 320, 105 S.Ct. 2633, 2646, 86 L.Ed.2d 231 (1985). We do not believe the State's argument reached the level of reversible error. The comments were moderate at most. The trial court correctly and positively instructed the jury in reference to aggravating and mitigating circumstances. Defendant did not challenge the sufficiency of the evidence of his guilt. This evidence was devastating against him and was supplemented by his own confession. We find the issue without merit.

Defendant also makes complaint that the State made an inference to the jury that he had engaged in conduct similar to that with which he was charged in this case, and

implied that if released he would do so again. We do not read the State's argument in that context. That particular part of the argument is murky at best but seems to make reference to the testimony of certain of the witnesses who indicated defendant had a tendency to behave violently toward others on occasion. We find this issue without merit.

Defendant contends that the trial court's instruction to the jury at the penalty phase of the proceeding was inadequate and defective. He says the definition of torture was insufficient and did not conform to the court rules published in January of 1986 revising the Criminal Jury Instructions.

In this case the State relied on four (4) aggravating circumstances to substantiate the death penalty:

(1) The murder was committed against a person less than twelve years of age and the defendant was eighteen years of age or older.

(2) The murder was especially heinous, atrocious, or cruel in that it involved torture or depravity of mind.

(3) The murder was committed for the purpose of avoiding, interfering with or preventing a lawful arrest or prosecution of the defendant or another.

(4) The murder was committed while the defendant was engaged in committing, or was an accomplice in the commission of, or was attempting to commit, or was fleeing after committing or attempting to commit rape.

In *State v. Williams*, 690 S.W.2d 517, 532 (Tenn.1985), this Court mandated that at a capital sentencing proceeding a jury must be instructed as to the statutory definition of felonies and the legal significance of other legal terms which are necessary for the jury to understand in determining whether or not aggravating circumstances defined in the statute have been established. In conjunction with that ruling the Pattern Jury Instructions utilized in criminal cases were revised to include definitions of felonies and legal terms in reference to the capital sentencing requirements. T.C.A. § 39–2–203(i)(5), establishes as an aggravating circumstance that "the murder was especially heinous, atrocious, or cruel in that it involved torture or depravity of mind." The terms used in that code section are defined in the instruction as follows:

"Heinous—grossly wicked or reprehensible; abominable; odious; vile.

Atrocious—extremely evil or cruel; monstrous; exceptionally bad; abominable.

Cruel—disposed to inflict pain or suffering; causing suffering; painful.

Torture—the infliction of severe physical pain as a means of punishment or coercion; the experience of this; mental anguish; any method or thing that causes such pain or anguish; to inflict with great physical or mental pain.

Depravity—moral corruption; wicked or perverse act."

The instruction as revised contains this further admonition: [1]

To show that the murder was especially heinous, atrocious, or cruel, the State must prove beyond a reasonable doubt that the killing involved torture of the victim or depravity of mind of the killer. Torture means the infliction of severe physical or mental pain upon the victim while he or she remained alive and conscious. Proof that such torture occurred also establishes that the murder involved depravity of mind of the murderer. Where the State fails to prove that such torture occurred, the State may offer to prove that the defendant possessed a depraved state of mind at the time of the killing. Depravity of mind means that the murderer's state of mind at the time of the killing must have been wicked or morally corrupt. Acts occurring after the death of the victim may be relied upon to show depravity of mind of the murderer, but such acts must be so close to the time of the victim's death and of such a nature that the inference can be fairly drawn that the depraved state of

---

1. T.P.J.I., Crim. 20.03, 2nd Ed., 1988. This instruction may also be found in Vol. 699–704 S.W.2d, p. XXXI.

mind of the defendant existed at the time that the fatal blows were inflicted upon the victim. If the length of time between the moment of death and those acts is so great that the inference cannot be fairly drawn that the murderer possessed such depravity of mind, then you may not find that the murder, itself, involved depravity of mind.

█ The defendant's complaint is that the trial judge failed to tell the jury the definition of torture requires that the victim be alive and conscious. In *State v. Porterfield*, 746 S.W.2d 441, 451 (Tenn. 1988), tried eight months after the *Williams* decision was released, this Court found that the defendant was not prejudiced by the trial court's failure to give the definitions of the terms "heinous," "atrocious," and "cruel" exactly as set out in *Williams* or to define "torture" or "depravity of mind" for the jury. After examining the definitions given by the trial court, we said:

"It would have been better had the trial judge used the definition set out in *State v. Williams*, 690 S.W.2d 517, 533 (Tenn. 1985), as they have been approved by this Court. However, the definitions given were in our opinion adequate. Further, we find no prejudicial error in the trial court's failure to define the terms "torture" or "depravity of mind." The evidence in this case supports the aggravating circumstance, Tenn.Code Ann. § 39-2-203(i)(5), as defined in *State v. Williams, supra*, ... Furthermore, the remaining two aggravating circumstances were correctly charged and are supported by the evidence."

The trial judge here did define both torture and depravity for the jury. He did not instruct them on the meaning of the word torture which includes that it must occur while the victim remains alive and conscious. The Pattern Jury Instructions have been drafted after a great deal of work and consideration on the part of the Judicial Conference Jury Instruction Committee. They have been prepared for the purpose of assisting trial judges in their duties and to aid in avoiding reversible error. There is no excuse for a trial judge not to follow the instructions as drafted. However, we do not find the shortcoming in this case resulted in reversible error. The jury was adequately instructed. Although the Pattern Jury Instructions specify that the torture must be inflicted while the victim is alive and conscious the instruction as given implicitly required that the victim be alive. Moreover, the facts overwhelming establish the defendant's depravity of mind. The homicide of this seven-year-old child in the process of committing vaginal and anal rape certainly meets the requirement of depravity.

As we have noted, defendant did not contest the sufficiency of the evidence at the guilt phase of the proceeding. In summary the State's proof was that Billy Ray Irick was a friend of the child's mother and step-father. He had lived with them for a time, often caring for the five (5) young children in the family while the Jeffers were working. At the time of the incident the Jeffers were separated. Mr. Jeffers and the defendant were living with Jeffers' mother. On the night of the occurrence Mrs. Jeffers left defendant with the children when she went to work. She was somewhat uneasy about this because defendant had been drinking, although he did not seem to be intoxicated. He was in a bad mood because he had been in an argument with Mr. Jeffers' mother earlier in the day. He did not want to keep the children since he planned to leave Knoxville for Virginia that night. Mrs. Jeffers called her husband at the truck stop where he worked to tell him of her fears. He reassured her and said he would check on the children.

About midnight Mr. Jeffers received a telephone call from Irick telling him to come home, suggesting there was something wrong with the little girl, saying, "I can't wake her up." When Jeffers arrived at the house defendant was waiting at the door. The child was lying on the living room floor with blood between her legs. After ascertaining she still had a pulse, Jeffers wrapped her in a blanket and took her to Children's Hospital. Efforts to re-

suscitate her there failed and she was pronounced dead a short time later.

Physical examinations of her body at the hospital emergency room and during the autopsy were indicative of asphyxiation or suffocation. The cause of death was cardiopulmonary arrest from inadequate oxygen to the heart. There was an abrasion to her nose near one eye and lesions on her right chin consistent with teeth or fingernail marks. Blood was oozing from her vagina, which had suffered an extreme tear extending into the pelvic region. There were less severe lacerations around the opening of her rectum in which semen and pubic hair were found. These injuries were consistent with penetration of the vagina and anus by a penis. The evidence was more than adequate to establish all of the elements of T.C.A. § 39–2–203(i)(5) that the murder was especially heinous, atrocious, or cruel in that it involved torture or depravity of mind. It also established beyond question that the child was alive at the time the described events occurred. Additionally, the jury found three other aggravating circumstances in returning their verdict, all of which were warranted by the evidence in the case. This issue is without merit.

 Defendant also points out that the trial court did not address the jury in the language of the statute in reference to mitigating circumstances. The judge did inform the jury of those mitigating circumstances on which the defense relied. He used the word "may" rather than "shall" in informing them they could consider any other appropriate mitigating circumstances to rebut the aggravating circumstances relied on by the State. Defendant says the charge was defective because the jury had the duty, not the option to consider mitigating circumstances. We think the trial judge's instruction on mitigating circumstances was adequate in that it substantially followed the statute. He also instructed the jury that, "you have now heard all of the evidence ... including all of the evidence as to .. whether there were any mitigating circumstances, all of which you will carefully weigh and consider." T.C.A.

§ 39–2–203(e) requires the trial judge to include in his instructions for the jury to weigh and consider any mitigating circumstances ... which may be raised by the evidence at either the guilt or sentencing hearing or both. See *State v. Buck*, 670 S.W.2d 600, 608 (Tenn.1984). Among those mitigating circumstances statutorily required are that the defendant has no significant history of prior criminal activity. The trial judge told the jury that defendant had never been convicted of any felony and, before this case, had never been arrested for any felony or for any misdemeanor involving moral turpitude. This was sufficient. T.C.A. § 39–2–203(j)(2) also requires, if sustained by the evidence, that the judge instruct the jury the murder was committed while the defendant was under the influence of extreme mental or emotional disturbance. There was no clear evidence of this fact in the record, however the jury was instructed that the defendant had a history of mental impairment that required him to be placed in an institution at a young age. They were also informed that the defense relied on the circumstance that he was under the influence of alcohol or marijuana at the time of the offense. Defendant was entitled to no more. Defendant also insists the jury should have considered his youth as a mitigating circumstance. He was twenty-six years of age at the time of the crime. There is no evidence that he was particularly immature for his age nor is there any authority to suggest that such an instruction is warranted for a person at the age of twenty-six. We have concluded that the jury instructions on mitigating circumstances as delivered were adequate and effective and the failure to use the exact words of the statute did not affect the sentencing decision to defendant's detriment.

Defendant makes a general allegation that the Tennessee Death Penalty Statute as applied constitutes cruel and unusual punishment and violates the Equal Protection and Due Process clauses of the Constitution. This Court has consistently upheld the constitutionality of the Act. See *State v. Porterfield*, supra.

We have reviewed these proceedings in accordance with the mandate of T.C.A. § 39-2-205 and find that the sentence of death was not imposed in an arbitrary fashion. The evidence supports the jury's findings of four (4) statutory aggravating circumstances and the absence of any mitigating circumstances sufficiently substantial to outweigh the aggravating circumstances found. We have considered the nature of the crime and the defendant and hold that the sentence of death is not excessive or disproportionate to the penalty imposed in similar cases. The sentence of death will be carried out as provided by law on the 15th day of January, 1989, unless otherwise ordered by this Court or by other proper authority. The sentences for aggravated rape are affirmed. Costs are assessed against the defendant.

HARBISON, C.J., and FONES, COOPER and DROWOTA, JJ., concur.