IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE

AT NASHVILLE

DECEMBER 1996 SESSION

FILED

June 30, 1997

Cecil W. Crowson
Appellate Court Clerk

| | | |
|---|---|---|
| STATE OF TENNESSEE, | ) | No. 01C01-9512-CC-00402 |
| | ) | |
| Appellee | ) | |
| | ) | MAURY COUNTY |
| V. | ) | |
| | ) | HON. JAMES L. WEATHERFORD, |
| WILLIAM CHARLES JONES, | ) | JUDGE |
| | ) | |
| Appellant. | ) | (Aggravated Assault) |
| | ) | |
| | ) | |

For the Appellant:

Claudia S. Jack
22 Public Square
P.O. Box 827
Columbia, TN 38402

For the Appellee:

John Knox Walkup
Attorney General and Reporter

Timothy F. Behan
Assistant Attorney General
450 James Robertson Parkway
Nashville, TN 37243-0493

T. Michael Bottoms
District Attorney General

Samuel D. Kennedy
Assistant District Attorney
10 Public Square
P.O. Box 1619
Columbia, TN 38402

OPINION FILED: _____

REVERSED AND REMANDED

William M. Barker, Judge

**OPINION**

The appellant, William Charles Jones, appeals as of right his conviction for the offense of aggravated assault by a Maury County Circuit Court jury. The trial court sentenced the appellant to three years as a Range I standard offender, ordering him to serve six months of that sentence in jail and the remainder on probation. The jury imposed a $10,000.00 fine. In his sole issue on appeal, the appellant argues that comments made by the prosecutor during closing arguments amounted to prosecutorial misconduct. The appellant contends that the prosecutor's arguments were so improper, inflammatory, and prejudicial that he was denied due process of law. After a careful review of the record on appeal, we agree with the appellant. Accordingly, the appellant's conviction is reversed and a new trial ordered.

**FACTUAL BACKGROUND**

The appellant was tried jointly with four other co-defendants, each being charged with the aggravated assault of James Terrell Foster late on the evening of August 29, 1993. As a result of the assault, Foster received serious injuries, was unconscious for approximately two days, was hospitalized, and had residual numbness in one of his lower extremities for approximately six months.

The events leading up to the assault began earlier in the day, at approximately 1:30 p.m., when Foster came out of his uncle's home to find that Kenyan Jones had laid some money on Foster's car. When Jones refused to remove the money from the automobile, the two young men fought briefly, neither sustaining any serious injury. Foster and Jones had occasion to fight each other again that night at a Columbia night spot, the 300 Club. Again, no serious injuries were sustained by either. Still later that same evening at the 300 Club, Terrell Foster's older brother, Tyrone Jermaine Foster, became engaged in a fight with Kenyan Jones which progressed to the point that Tyrone Foster had Jones in a standing choke hold and was choking him to the extent that Jones' eyes began to "bug out" and "roll back in his head."

2

Prior to the time of the fight between Tyrone Foster and Kenyan Jones, a large crowd had gathered at the 300 Club. Some people were inside the club where a disk jockey was playing music and food and drinks were available, but many others were outside in the parking lot and on the street. A witness described the outside scene as a street party, where between one hundred and three hundred people were gathered, talking, drinking, and socializing.

As Tyrone Foster was getting the better of Kenyan Jones, a group of people rushed in to aid Jones and it took several people to break up the fight. Shortly thereafter, the group of people turned to the victim, who was standing nearby outside a coin laundry. Testimony revealed that one of the defendants struck the victim, causing him to be thrown against the wall of a coin laundry. People in the crowd rushed in and began throwing punches. The victim, knocked down by numerous blows, lay on the ground trying to defend himself. Many people kicked him, spat on him, and threw things at him. Several individuals made fruitless efforts to break up the fight, which continued until the police arrived. The victim was found lying unconscious on the pavement.

Three of the State's witnesses present at the scene testified that they saw the appellant kicking and stomping the victim. They each agreed that appellant either jumped off a car onto the victim or leaped around a car to get at the victim. However, their testimony conflicted on several other details, including each one's presence at the scene and what they were able to observe. Lisa Owen, a cousin of the victim, testified that after the fight appellant complained to her that his foot hurt because he "stomped Terrell too much." She added that approximately three weeks prior to the trial, the appellant admitted to her that he was sorry for his actions because he was drunk that night and did not know what he was doing.

The police did not interview anyone at the scene of the assault, but later interviewed Lisa Owen while she was at the hospital with the victim. She provided

3

police with names of four of the defendants as the victim's attackers and later gave a formal written statement which named all five defendants.

James Terrell Foster, the victim, was unable to identify any of his attackers. He testified that while he stood near the coin laundry, a man approached him, called him an obscene name, and swung at him. He responded defensively, but the fight escalated because so many people were involved. He was unable to conclusively say whether any of the defendants injured him. Foster testified that he remained unconscious after falling to the ground until he woke up in the hospital two days later. In describing his injuries, he stated that he had scratches all over his legs, four stitches in his head, a large cut from his shoulder down to his lower back, and cuts over both eyes which caused extensive swelling. His foot was also injured and it remained numb for six months after the assault. Due to his injuries, Foster testified that he was unable to pass the physical examination required for entrance into the Air Force.

Testifying in his own defense at trial, the appellant stated that earlier in the evening he had attended a local high school football jamboree with friends and then went to the 300 Club. However, he denied his presence at the fight, claiming that he was inside the club during the melee. By the time he received word about the fracas and went outside, the ambulance had already arrived. He testified that he observed Foster lying on the ground outside the coin laundry, but immediately returned inside at the urging of police who were at the scene. Appellant denied any participation in the incident and stated that he did not jump off of anyone's car for any reason. He stated that he did not participate in the fight because it did not involve him and he had no reason to injure Foster.

Appellant, along with two other defendants, was convicted of aggravated assault and fined $10,000.00 by the jury. One of the defendants was convicted of simple assault and the remaining defendant was acquitted.

**CLOSING ARGUMENTS**

The appellant argues that he was denied a fair trial when, during closing arguments, the assistant district attorney: (1) improperly interjected race into the record; (2) mischaracterized the evidence repeatedly by referring to the assault as "gang violence;" (3) urged the jury to "send a message to the community" with a guilty verdict; and (4) encouraged a finding of guilt on a lesser standard than proof beyond a reasonable doubt. We agree.

During the State's rebuttal argument, the prosecutor made the following statement regarding race:

> PROSECUTOR: But ladies and gentlemen, what's going on here, what we're talking about is black on black crime in this community. Now, we have a jury of 11 white males and one lady, all of the lawyers and the Judge, all of us, obviously white. Judging on black on black crime in this community . . . . I wished and I prayed for a black juror on this jury but it didn't happen . . . . I understand the black community. That's the way the jury system works. I welcome this jury. This is a jury that lives in this community. This is a jury that's concerned about this community. But the old Southern tradition was that well, what those folks are doing over there, we don't worry about, we just surround that area on weekends and then come Monday morning we go in there and take the bodies out.
>
> ATTORNEY: If Your Honor, please, I object.
>
> THE COURT: All right. Approach the bench a minute.
>
> THE COURT: Now, there hasn't been anything said about race in this, and I don't see a whole lot of need in getting into that. There just hasn't been anything like that. It would probably be better not to get into that any further than you have. Don't withdraw anything, but I think that is about as far as you need to go.

In addition to injecting the element of race into the trial, the prosecutor characterized the fight as one resulting from "gang violence." During argument, the prosecutor made reference to gang violence on nine different occasions. The evidence at trial clearly established the victim had been attacked by several assailants, but there was no evidence indicating the assault was the work of a "gang" as that term is commonly understood in today's society.

5

The following are examples contained in the record of the prosecutor's references to gang activity:

[The victim] said I got it right up the middle, said but I really don't know what went on. . . . And after that it was on a riot. A riot, a gang assault, whatever you want to call it, you can use all those conclusory type words, but that's what we've got here, a riot, a gang assault, I mean it was just on. The crowd went in and these five over here aren't the only ones, you all know that. But these are the five that we have before us here today.

* * * * *

It is our community. And wherever there is gang violence. . . . in our community it concerns us.
Now, in this particular case we've got a situation. . . where we've got gang violence. But we as a community, we all raise our hands when we said we're against crime. Some of us shook our heads as we were talking about the facts of the case or the gang violence. . . . Nothing happens without your verdict.

* * * * *

The police can't do anything. The Judge can't do anything. The governor can't do anything. But this is it. This is where the buck stops. And this is as good as it gets in a case of this type.
This jury, by its verdict, sends a message. Now, the message either is when. . . there's a gang assault, there's going to be something done about it. The message is that when you come up here and . . . there's a gang assault and there's all sorts of conflicting evidence . . . we just can't figure it out and there's nothing that can be done. Take it back out into the streets.

* * * * *

This is where Mr. Foster, and Mr. Foster, his son, come as members of this community to ask you . . . to help them, . . . to do something about gang violence in this community.

ATTORNEY: I object at this point . . . .

COURT: Well, this is final argument. I'm going to let him go ahead. Overrule your objection.

The prosecutor also encouraged the jury to "send a message" by its verdict and, in addition, described the burden of proof as follows:

PROSECUTOR: The burden which you have -- the burden -- I represent the State or the people as you see it on television. You are the people. You represent the people of this community --

ATTORNEY: Your Honor, I object.

6

THE COURT: Well, this is final argument. I'm going to let him go ahead. Overrule your objection. Go ahead, General.

PROSECUTOR: The burden of proof which we impose is our burden. The burden which says that before somebody can be convicted it must be shown beyond a reasonable doubt that they're guilty, and that is a burden that we . . . have decided is . . . proper. That's the burden that we would want if it was us or ours that were on trial. But, ladies and gentlemen, what that means, what that means, reasonable doubt. . . is common sense, doubts based on common sense, just a good old plain ordinary definition. And I submit to you that what that means, what that means is that if you're at Saturn, say at work six months from now, and you're talking and you turn around to the fellow who's next to you and you say, you know, we tried that case back six months ago, and I was just confused about a lot of the things and some things didn't make sense, and the State didn't carry its burden, and we had to return a verdict of not guilty, but I know those old boys did it. If you're saying that to yourself, and you're saying that to the folks who work with you six months from now, then your mind does rest easy. And then you know, you are comfortable in your mind that the burden was carried and your duty under that set of circumstances to your community is to return a verdict of guilty.

Don't send the message out that there's nothing that can be done. Now, if you're -- where is going to be the doubt?

Now, your mind can rest easy on who did it. You know who did it. Or at least you know some of who did it. You know there are more. You know there are more, but you know some of who did it. And the verdict which is appropriate, which truth dictates and justice demands is guilty. And if you're turning around two or six months from now at the lunch counter then you don't have a reasonable doubt if you're saying, well, I know they did it. And if you're saying, well, I know they did it but, then you've not done your duty to your community.

ATTORNEY: If Your Honor please, in accordance with the mandates of the case law, I contemporaneously object to preserve --

THE COURT: All right. Note your objection. Go ahead.

PROSECUTOR: To send a message, to send a message. You should do it only if you have no reasonable doubt as to the guilt of these five men. But I submit to you that reasonable doubt is like I say, if you turn around inside of six months from now and say I know he did it, then you really didn't have a reasonable doubt. If you say I know he did it but then you haven't done your duty to your community. The verdict which truth dictates and justice demands is a verdict of guilty. Hang in with your convictions. Thank you.

## ANALYSIS

In evaluating the appellant's challenge to the prosecutor's closing arguments, we must consider several well-settled principles of law. Closing argument is a valuable privilege for both parties and the trial courts generally allow wide latitude to

counsel in arguing their cases to the jury. State v. Bigbee, 885 S.W.2d 797, 809 (Tenn. 1994)(citations omitted). However, trial judges must preserve courtroom decorum and have authority to restrict any improper commentary. Coker v. State, 911 S.W.2d 357, 368 (Tenn. Crim. App. 1995)(citations omitted). Closing argument must be temperate, must be based upon evidence produced at trial, and pertinent to the issues at trial. State v. Sutton, 562 S.W.2d 820, 823 (Tenn. 1978). Moreover, closing argument must be evaluated considering its context, including the facts in evidence, the character of the trial, and the conduct of opposing counsel. Coker, 911 S.W.2d at 368 (citations omitted).

Although improper argument may often be harmless in the overall scheme of a trial, reversal is mandated when the impropriety affected the verdict to the prejudice of the defendant. Harrington v. State, 385 S.W.2d 758, 759 (Tenn. 1965). In determining whether improper argument has resulted in such prejudice, the following factors are relevant: (1) the conduct in light of the facts and circumstances of the case; (2) any curative measures taken by the court; (3) the intent of the prosecutor in making the statements; (4) the cumulative effect of the improper conduct and other errors in the record; and (5) the relative strength or weakness of the case. Judge v. State, 539 S.W.2d 340, 344 (Tenn. Crim. App. 1976). Our Supreme Court has approved the adoption of those considerations in State v. Buck, 670 S.W.2d 600, 609 (Tenn. 1984).

Racial considerations should play absolutely no part in any trial unless they are directly related to the issues fairly raised by the evidence in the record. State v. Sparks, 563 S.W.2d 564, 569 (Tenn. Crim. App. 1978). It can hardly be said that the proof presented in this trial "fairly raised" the issue of race. The trial court remarked, in considering the appellant's motion for a new trial, that a reading of the transcript from the beginning of the trial until the prosecutor made his closing argument would not have revealed the race of anyone connected with this trial. When confronted with this identical issue, this Court has held that a prosecutor's gratuitous interjection of racial

8

issues in his closing argument resulted in prejudice to the defendant which required reversal. Sparks, 563 S.W.2d at 569. We find the prosecutor's racial remarks in this case particularly offensive.

Secondly, we must consider the curative instructions and corrective measures undertaken by the trial court. Unfortunately, in appellant's case, the trial court failed to provide the jury with any such instructions. The trial court later explained at the hearing on the motion for a new trial that he did not give curative instructions because he felt they would only serve to emphasize the improper comments of the prosecutor. Nevertheless, a curative instruction may have served to minimize the prejudice to the appellant. See State v. Hunt, 665 S.W.2d 751, 755 (Tenn. Crim. App. 1984)(holding that prompt curative instructions by the trial court following a prosecutor's improper argument prevented prejudice to the defendant).

The intent of the prosecutor is also relevant to our evaluation of the prejudicial effect of his argument. We believe the assistant district attorney here acted purposefully; he deliberately injected the element of race into the jury's deliberations through his closing argument. The comments of the prosecutor improperly urged the jury to make race a factor in its decision.

Additionally, the prosecutor made at least nine references to "gang," "gang assault," or "gang violence" in his closing argument. Although counsel for the defense objected to the prosecutor's characterization of this assault as gang-related, the trial court overruled those objections. The only evidence offered in that regard was that the defendants were all friends who frequented the 300 Club and "hung out together." The prosecutor may have intended to equate gang violence with a riot and not to organized gang activity; however, many citizens do associate gang violence with organized gang activity. If this were the only questioned portion of the argument, it would not be of sufficient severity to require reversal. It takes on added significance, however, when combined with the other inflammatory arguments. State v. Bigbee, 885 S.W.2d 797, 812 (Tenn. 1994).

9

Other portions of the prosecutor's final argument were also improper. He urged the jury to "send a message to the community" and made references to the deterrent effect a guilty verdict would have as well as the unfortunate consequences of an acquittal. Such argument is improper. Argument may not encourage a jury to consider general deterrence. State v. Henley, 774 S.W.2d 908, 913 (Tenn. 1989), cert. denied 497 U.S. 1031, 110 S. Ct. 3291, 111 L. Ed. 2d 800 (1990); State v. Irick, 762 S.W.2d 121, 131 (Tenn. 1988), cert. denied 489 U.S. 1072, 109 S. Ct. 1357, 103 L. Ed. 2d 825 (1989). See also State v. Marshall, 870 S.W.2d 532, 541 (Tenn. Crim. App. 1993). This prohibition has been applied to a "crime in the streets" argument, an argument that the jury's verdict makes a statement, and arguments that a jury's verdict demonstrates that a community will not tolerate criminal behavior. See Henley, 774 S.W.2d at 913; Irick, 762 S.W.2d at 131; Marshall, 870 S.W.2d at 541. The prosecutor's argument in this regard clearly encouraged the jury to base its decision, at least in part, on a desire to curb violence in Columbia and to send a message. Deterrence is completely irrelevant to the question of guilt or innocence and therefore outside the scope of the jury's consideration. Similarly, there should be no commentary on the consequences of an acquittal. Coker, 911 S.W.2d at 368.

Finally, the appellant complains that the prosecutor improperly and prejudicially implored the jury to return a verdict of guilt even if the State had not proved that guilt beyond a reasonable doubt. In that respect, the prosecutor told the jury:

> . . . [I]f you're at Saturn, say at work six months from now, and you're talking and you turn around to a fellow who's next to you and you say, you know, we tried that case back six months ago, and I was just confused about a lot of things and some things didn't make sense, and the State didn't carry its burden, and we had to return a verdict of not guilty, but I know those old boys did it. If you're saying that to yourself, and you're saying to the folks who work with you six months from now,

then your mind does rest easy. And then you know you are comfortable in your mind that the burden was carried and your duty under that set of circumstances to your community is to return a verdict of guilty.

Again, counsel for the defense objected to that portion of the State's arguments, but the trial court overruled the objection. The argument of the prosecutor regarding reasonable doubt was an incorrect statement of the law, was prejudicial to the appellant, and was improper. The trial judge erred in not sustaining the objection to that portion of the argument and in not giving an immediate curative instruction. In substance, the assistant district attorney was telling the jury that even if it were confused by the evidence, and even if the State had not proved the appellant's guilt beyond a reasonable doubt, it should convict the appellant nevertheless if the individual jurors somehow knew in their "heart of hearts" that he was guilty. That is simply not the law in this State, and obviously a verdict based upon such a standard would violate the appellant's constitutional right to due process of law.

Finally, Judge v. State requires us to consider the relative strength or weakness of the State's case in determining whether the improper argument requires a new trial. Closing argument may influence the jury verdict in a close case, and when it is improper, we must question the integrity of the verdict. Although the evidence was sufficient for a reasonable jury to return a guilty verdict, the State's proof could not be characterized as overwhelming. Only one eyewitness, Delvin Frierson, did not have his credibility attacked, and he was a solid witness for the State with strong testimony. The other eyewitnesses testifying for the State gave testimony which contained inconsistencies. Although the credibility of the witnesses is always a matter for the jury, when the proof is marginal and based primarily upon questions of credibility, it is more likely that improper comments by the prosecutor resulted in prejudice to the defendant. See Judge, 539 S.W.2d at 346.

In sum, we simply cannot say that the numerous improper comments made by the prosecutor during closing argument were harmless. Rather, we are convinced that the prosecutor's comments cumulatively resulted in prejudice to the appellant. The

deliberate and intentional interjection of race into the trial, deceptive references to gang activity, the call for the jury to send a message by its verdict, even if that verdict was not based upon proof beyond a reasonable doubt require that the verdict of guilt be set aside and that a new trial be granted. Accordingly, the appellant's conviction is reversed and this case is remanded to the trial court for a new trial.

 

_____

William M. Barker, Judge

 

_____

Paul G. Summers, Judge

 

_____

Joe G. Riley, Judge