IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs January 25, 2011

**BILLY RAY IRICK v. STATE OF TENNESSEE**

**Appeal from the Criminal Court for Knox County**
**No. 24527      Richard R. Baumgartner, Judge**

---

**No. E2010-02385-CCA-R3-PD - Filed May 23, 2011**

---

The petitioner, Billy Ray Irick, appeals from the Knox County Criminal Court's denial of his petition for writ of error coram nobis, which challenged his 1987 convictions of felony murder and aggravated rape and resulting death sentence. On appeal, the petitioner claims that the coram nobis court erred by ruling that due process considerations did not toll the one-year statute of limitations applicable to coram nobis petitions, *see* T.C.A. § 27-7-103 (2000), and that the newly discovered evidence "would not have" resulted in a different verdict had it been presented to the convicting jury. Discerning no error, we affirm the judgment of the coram nobis court.

**Tenn. R. App. P. 3; Judgment of the Criminal Court Affirmed**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the Court, in which NORMA MCGEE OGLE and D. KELLY THOMAS, JR., JJ., joined.

C. Eugene Shiles, Jr., and Howell C. Clements, Chattanooga, Tennessee, for the appellant, Billy Ray Irick.

Robert E. Cooper, Jr., Attorney General and Reporter; James E. Gaylord, Assistant Attorney General; Randall E. Nichols, District Attorney General; and Leland Price and Kenneth Irvine, Jr., Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

*Factual and Procedural History*

In 1986, a Knox County Criminal Court jury convicted the petitioner of one count of felony murder and two counts of aggravated rape concerning acts committed on the

seven-year-old victim, P.D.[1]  Our supreme court summarized the evidence presented to the jury at the guilt phase of the petitioner's trial:

> In summary, the State's proof was that [the petitioner] was a friend of the child's mother and step-father.  He had lived with them for a time, often caring for the five (5) young children in the family while the Jeffers were working.  At the time of the incident the Jeffers were separated.  Mr. Jeffers and the [petitioner] were living with Jeffers' mother. On the night of the occurrence Mrs. Jeffers left [the petitioner] with the children when she went to work.  She was somewhat uneasy about this because [the petitioner] had been drinking, although he did not seem to be intoxicated.  He was in a bad mood because he had been in an argument with Mr. Jeffers' mother earlier in the day.  He did not want to keep the children since he planned to leave Knoxville for Virginia that night.  Mrs. Jeffers called her husband at the truck stop where he worked to tell him of her fears.  He reassured her and said he would check on the children.
>
> About midnight Mr. Jeffers received a telephone call from [the petitioner] telling him to come home, suggesting there was something wrong with the little girl, saying, "I can't wake her up."  When Jeffers arrived at the house [the petitioner] was waiting at the door.  The child was lying on the living room floor with blood between her legs.  After ascertaining she still had a pulse, Jeffers wrapped her in a blanket and took her to Children's Hospital.  Efforts to resuscitate her there failed and she was pronounced dead a short time later.
>
> Physical examinations of her body at the hospital emergency room and during the autopsy were indicative of asphyxiation or suffocation.  The cause of death was cardiopulmonary arrest from inadequate oxygen to the heart.  There was an abrasion to her nose near one eye and lesions on her right chin consistent with teeth or fingernail marks.  Blood was oozing from her vagina, which had suffered an extreme tear extending into the pelvic region.  There were less severe

---

[1] It is the policy of this court to refer to child victims of sexual offenses by their initials.

lacerations around the opening of her rectum in which semen
and pubic hair were found. These injuries were consistent with
penetration of the vagina and anus by a penis.

*State v. Irick*, 762 S.W.2d 121, 133-34 (Tenn. 1988) (*Irick I*).

At the outset, we note that the petitioner did not include relevant excerpts from
the trial transcript or trial exhibits in the record on appeal. Indeed, although it appears that
the petitioner relied upon these documents as they were previously considered by the coram
nobis court in separate proceedings concerning the petitioner's motion to reopen his post-
conviction action and the hearing on his competency to be executed, he did not exhibit them
at the coram nobis hearing. Because it is apparent from the record that the coram nobis court
considered these items in its assessment of the petitioner's coram nobis claim, we have taken
judicial notice of the relevant evidence from the appellate records of the earlier proceedings.
*See State v. Lawson*, 291 S.W.3d 864, 869-70 (Tenn. 2009).

The evidence presented by the defense during the penalty phase of his trial
included testimony from and documentary evidence introduced through Nina Braswell-Lunn,
a licensed clinical social worker who had worked with and treated the petitioner from March
1965, when he was six years old, until August 1967, when he was eight years old. Through
Ms. Braswell-Lunn, the sentencing jury learned that in March 1965, the petitioner, while still
in the first grade, was referred by his school's principal to the Knoxville Mental Health
Center (hereinafter "the Center")[2] to determine whether the petitioner's extreme behavioral
problems and unmanageability in school were the result of emotional problems or whether
the petitioner suffered from some form of "organic brain damage."

Ms. Braswell-Lunn conducted the initial intake assessment of the petitioner on
behalf of the Center, and her written report from that assessment was introduced into
evidence at the sentencing phase of the petitioner's trial. It stated in pertinent part as follows:

The difficulties that the Irick[]s have experienced with [the
petitioner] are of apparent long standing. At the present time
[age six] he is overly aggressive, is difficult to manage, is very
difficult to discipline particularly. He apparently mistreats
animals; this is something that is particularly evident with his
cat. He is hyperactive all during the night, he talks in the
nighttime and rumages [sic] about the house. He prowls and

---

[2] Counsel explained that the name of this facility was subsequently changed to the Helen Ross-
McNabb Mental Health Center.

meddles a great deal at home and at school. He has for a couple of years been telling people outside the home that his mother mistreats him, that she ties him up with a rope and beats him and he also has told neighbors and other people of his parents being naked in bed and this kind of thing. Both parents show considerable concern over the fact that it seems to them that [the petitioner] does not really relate to them, that he is in pretty much of a world of his own. They state that when they correct him or try to talk with them [sic] he only gives them a blank meaningless stare. According to [Doctor] Harvell, the Principal of Lincoln Park School, [the petitioner] is almost completely unmanageable there. [Doctor] Harvell has attempted to cope with [the petitioner]'s behavior by taking him out of the classroom and sitting with him in the cafeteria and has tried various means of disciplining and apparently the boy has not responded. . . . He sees the boy as excessively demanding and quite difficult to cope with.

Ms. Braswell-Lunn's report also recounted the petitioner's mother's account of the difficult pregnancy she had with the petitioner, "almost los[ing] the baby several times," as well as the complications during the petitioner's delivery, resulting in her doctor telling her that the petitioner was "almost a blue baby." The report concluded with the following:

At around the time of the birth of the younger brother Jeffrey, [the petitioner] was talking enough that he began telling stories of his mother's mistreating him, of tying him up and beating him. Mrs. Irick apparently takes all this very seriously, in effect internalizes the verbal attacks from the boy. I would raise the question of how much of this behavior on [the petitioner]'s part is actually stimulated by the mother through unconscious mechanisms. It seems very apparent that Mrs. Irick is an emotionally unstable person. . . .

Ms. Braswell-Lunn testified at the petitioner's sentencing hearing that the descriptions of the petitioner's behavior and condition at the time of her initial assessment of him in 1965, particularly the "anxiety," "aggression," and "unmanageable behavior," "present[ed] a picture that we see in many children today who have been abused."

A report prepared in April 1965 by Doctor Kenneth B. Carpenter, the psychiatrist-director of the Center, was also introduced into evidence at the sentencing

hearing through Ms. Braswell-Lunn's testimony. Doctor Carpenter's report contained the following observations and clinical assessments of the petitioner:

> The [petitioner] is reported as highly unmanageable with extremely angry aggression and some question of organic brain damage. The referral is significant in that the mother's sister has a child who is in the Psychiatric Unit at Vanderbilt because of severe emotional problems. . . . In the playroom he appeared quite anxious with a rather short attention span and hyperactive behavior. . . . There was much concern with good and bad and the patient seemed quite anxious that I would find him to be bad. . . . His reality perceptions are deficient and the patient has only slight awareness of this. The possibility of brain damage in this case is fairly great.

Doctor Carpenter's diagnostic impression was "[a]djustment reaction of childhood vers[u]s organic brain damage vers[u]s childhood schizophrenia." Doctor Carpenter recommended further psychological testing of the petitioner.

A report prepared in May 1965 by Doctor John A. Edwards, the clinical psychologist at the Center who performed the recommended psychological testing on the petitioner, was also introduced into evidence at the petitioner's sentencing hearing through Ms. Braswell-Lunn. Doctor Edwards' report contained the following assessment of the petitioner gleaned from the results of various standardized tests:

> Moderate to severe emotional difficulties are revealed by [the petitioner] throughout the test data. At the present time he appears to be suffering from a severe neurotic anxiety reaction with the possibility of mild organic brain damage. He experiences intense hostility directed primarily at family members which is generally expressed in a rather indirect fashion. His emotional control however, is becoming much less effective so that he is beginning to exhibit considerable emotional lability. He tends to fear his own impulses as well as being threatened from those in his environment; in fact, he seems to be over-whelmed and at the mercy of other people. A strong need for structure and attention is much in evidence throughout the test data as are feelings of self-depreciation, exceptional weakness, and feelings of being impotent to deal with his environment. [The petitioner] gives evidence of having

an exceptionally active fantasy life with some possible atypical thinking. He tends to perseverate on themes involving being passively at the mercy of a hostile world; there are suggestions that he may attempt to cope with the threat he feels from others as well as his own hostility through such means as bed-wetting or fire-setting. There is little doubt that this boy's explosive outbursts in the class room are the result of his inability to do so at home and his feeling somewhat more comfortable at school. [The petitioner] is not now actively schizophrenic although he appears to be severely disturbed and at times somewhat disorganized. . . .

Doctor Edwards' diagnostic impression was "[p]sychoneurosis, anxiety reaction, severe, with possible mild organic brain damage."

Ms. Braswell-Lunn testified at the petitioner's sentencing hearing that the staff at the Center were "very specific about the need for the involvement of [the petitioner's] parents in therapy that was going on and that there was considerable functional weakness in that situation." She further testified that the petitioner's mother "had psychiatric problems of her own and was just not able to function in the role of a parent for [the petitioner]." She testified that the petitioner's father also was not supportive and that the staff at the Center "were not able really to keep [the petitioner's parents] involved in treatment." As a result of the lack of parental involvement in treatment, and the school system's not being equipped to handle the petitioner's special needs, Ms. Braswell-Lunn testified at the sentencing hearing that the Center began working toward having the petitioner admitted for treatment at Eastern State Hospital, known now and at the time of the sentencing hearing as Lakeshore Mental Health Institute.

After the petitioner had been hospitalized at Eastern State Hospital, Ms. Braswell-Lunn continued to pursue alternative placements for him. In a letter written by her in November 1966 in support of a request to have the petitioner placed in a Church of God Home in Sevierville, Tennessee, she explained as follows the petitioner's condition at the time and progress during her treatment with him:

This boy's behavior was first brought to our attention by the school system, at which time he was adjusting very poorly to the first grade. His difficulties have increased to some extent since that time, that is, since their first visit here, but this is true also of his environmental situation. [The petitioner]'s mother has become increasingly more disturbed to the point that recently

she had to be placed on heavy medication and the possibility of hospitalization for her is still being considered. It was at this time that we decided to hospitalize [the petitioner] at Eastern State in an effort, in part, to remove him from the home situation in which his mother's disturbance so strongly [a]ffects [the petitioner]. The father has had [a] very unstable work situation with low income and he recently changed jobs again. He could not be depended upon to stabilize this home situation, therefore, add[ing a] reason for our taking the steps that we did in placing [the petitioner] in the hospital. I have continued to see [the petitioner] on a weekly basis at the hospital and would want to continue to see him in treatment if he were placed in the Home. [The petitioner] has been on medication since his earliest visits here at the Center and this would also need to be continued. . . .

In summary, my impressions of [the petitioner] after seeing [him] in treatment on a twice weekly basis is that [he] does relate though at times he is very withdrawn and he becomes quite anxious and at those times he is distractable and it is difficult to involve him in interpersonal relationships. . . . [The petitioner] is not aggressive though apparently he does tease. When [the petitioner] is confronted with a situation or an activity with which he can't cope too effectively, he tends to turn his anger on himself rather than on others.

To my knowledge, at the present time [the petitioner] has made a good adjustment at the hospital though his experience has made him quite anxious. There has been one matter of concern to me in my visits to him in that he has at no time asked about his parents or his home. This child has felt the rejection of his home situation, his mother in her disturbance is unable to give to the child many of the things that he needs.

A copy of this letter was admitted into evidence at the petitioner's sentencing hearing. In a follow-up letter to the Church of God Home written in March 1967, which was also introduced into evidence at the sentencing hearing, Ms. Braswell-Lunn described a deterioration in the petitioner's condition while hospitalized. She emphasized in this follow-up letter, however, that the petitioner's condition then was "certainly no worse than it was prior to hospitalization."

In response to the testimony of Ms. Braswell-Lunn, the State presented testimony at the sentencing hearing from Doctor Clifton R. Tennison, Jr., a psychiatrist employed at the time of trial at the Center. Doctor Tennison testified that, pursuant to court order, he had performed a pretrial mental health evaluation of the petitioner to determine both his competency to stand trial and mental condition at the time of the offenses. Doctor Tennison testified that his conclusions were that the petitioner understood the nature of the proceedings against him such that he could assist in his own defense (competency to stand trial) and that he was not suffering from any mental disease or defect at the time of the crime that prevented him from appreciating the wrongfulness of his conduct (sanity at the time of the offense). Doctor Tennison explained to the sentencing jury that his diagnostic impression of the petitioner was that he suffered from an anti-social personality disorder. Doctor Tennison stated, however, that in his evaluation of the petitioner he was looking for "major mental illnesses" such as "psychotic disorders, affective disorders, or severe anxiety disorders," and not personality disorders. Doctor Tennison explained to the sentencing jury that he did not conduct any further examination of the petitioner to determine the cause and treatment for his personality disorder because such a disorder, under the laws of the State of Tennessee, could not support the legal conclusion that the petitioner was incompetent to stand trial or insane at the time of a criminal offense. Upon further questioning by the trial court, Doctor Tennison testified that, by definition, a feature of the anti-social personality disorder was an unwillingness or inability to take into consideration the rights of others. He acknowledged, however, that there were no diagnostic measures that would allow the medical community to determine whether the lack of consideration of the rights of others was "due to an inability or [rather] an unwillingness" to consider others' rights.

On cross-examination, Doctor Tennison admitted during his sentencing phase testimony that he had determined as part of his evaluation that the petitioner's judgment was impaired. Doctor Tennison further testified that, while "[n]o evidence of psychotic phenomena w[as] observed" in the petitioner, the petitioner did report "vague auditory illusions or misperceptions described as hearing sounds or noises which bothered him and sometimes startled him when no one was around." Doctor Tennison, however, testified at the sentencing hearing that these self-reports did not "qualify as what we call a discrete hallucination."

Based upon the evidence presented at the sentencing hearing, the trial court instructed the jury that it could weigh and consider, against the aggravating circumstances relied upon by the State, the following mitigating circumstances supported by the evidence, including any other appropriate mitigating circumstances supported by the evidence: (1) that the petitioner had never before been convicted of any felony and, before this case, had never been arrested for any felony; (2) that the petitioner had never been arrested for or convicted of any misdemeanor involving moral turpitude; (3) that the petitioner had a history of mental

impairment that required him to be placed in an institution at a young age; (4) that the petitioner was under the influence of alcohol or marijuana at the time of the offense; (5) that the petitioner had attempted to obtain help for the victim after the crime; and (6) that the petitioner had shown remorse. *See Irick I*, 762 S.W.2d at 134; *Irick v. State*, 973 S.W.2d 643, 661 (Tenn. Crim. App. 1998), *perm. app. denied* (Tenn. June 15, 1998), *cert. denied*, 525 U.S. 895 (1998) (*Irick II*). Because there was no "clear evidence" to support it, *see Irick I*, 762 S.W.2d at 134, the trial court did not instruct the jury to consider the statutory mitigating circumstance that "[t]he murder was committed while the defendant was under the influence of extreme mental or emotional disturbance," *see* T.C.A. § 39-13-204(j)(2) (formerly T.C.A. § 39-2-203(j)(2)).

After considering the evidence presented at the penalty phase, the jury imposed a sentence of death for the petitioner's conviction of felony murder, finding that the aggravating circumstances relied upon by the State outweighed the mitigating circumstances presented by the defense. *See Irick I*, 762 S.W.2d at 132-35. The petitioner received two concurrent forty year sentences for the aggravated rape convictions to be served consecutively to the death sentence. *See id.*

On direct appeal, the Tennessee Supreme Court affirmed the petitioner's convictions, the sentences imposed for the aggravated rape convictions, and the sentence of death. *See id.* at 135. The petitioner's timely filed petition for post-conviction relief was denied following a hearing. This court affirmed the denial of post-conviction relief on appeal. *See Irick II*, 973 S.W.2d at 661. To date, the petitioner's efforts to obtain relief in the federal courts have also proven unsuccessful. *See Irick v. Bell*, 565 F.3d 315 (6th Cir. 2009), *cert. denied*, ___ U.S. ___ , 130 S.Ct. 1504 (2010).

By order entered on July 19, 2010, the Tennessee Supreme Court directed prison officials to execute the petitioner's sentence of death on December 7, 2010, "or as soon as possible thereafter within the following twenty-four hours." *State v. Billy Ray Irick*, No. M1987-00131-SC-DPE-DD, at 2 (Tenn. July 19, 2010) (order). In that same order, the court also directed the Knox County Criminal Court to determine expeditiously, in accordance with the procedures and time limits set forth in *Van Tran v. State*, 6 S.W.3d 257, 267-73 (Tenn. 1999), whether the petitioner presently is competent to be executed. An evidentiary hearing was held on August 16 and 17, 2010, at which time the petitioner and the State presented evidence germane to the question of the petitioner's present competency to be executed. At the hearing, the petitioner presented testimony from Doctor Peter Brown, a forensic psychiatrist, and Ms. Braswell-Lunn, the social worker who had testified at the

penalty phase of the petitioner's trial.[3]  On August 20, 2010, the trial court issued a written order ruling that the petitioner was competent to be executed.  The supreme court affirmed this determination on appeal.  *See generally State v. Irick*, 320 S.W.3d 284 (Tenn. 2010) (*Irick III*).

Meanwhile, on June 28, 2010, the petitioner filed a motion to reopen his post-conviction petition on grounds that the psychiatric test results and opinions of Doctor Brown constituted new scientific evidence establishing the petitioner's actual innocence of the crimes for which he was convicted.  Specifically, the petitioner claimed that Doctor Brown's test results and opinions established that the petitioner was legally insane at the time of the offenses.  The post-conviction court dismissed the petitioner's motion without a hearing. This court denied the petitioner's application for permission to appeal from the dismissal of the motion to reopen. *See generally Billy Ray Irick v. State*, No. E2010-01740-CCA-R28-PD (Tenn. Crim. App., Knoxville, Sept. 16, 2010) (order).

*Petition for Writ of Error Coram Nobis*

On October 14, 2010, the petitioner filed the petition for writ of error coram nobis that is the subject of this appeal.  In his petition and accompanying memorandum of law, the petitioner asserted that during his federal habeas corpus proceedings and subsequent efforts to obtain relief from his convictions and death sentence, he had discovered new evidence which, had it been known and presented to his jury, would have resulted in a different outcome during both the guilt and penalty phases of his trial.  The petitioner argued that the new evidence relied on in support of his petition demonstrated that he was legally insane at the time of his offenses as a result of severe mental illness.  In the alternative, the petitioner argued that even if the new evidence fell short of demonstrating that he was legally insane at the time of his offenses, the new evidence would have been viewed by the jury as mitigating and would have resulted in a sentence of life imprisonment rather than death.  The evidence relied on in support of the petition can be grouped into five separate categories.

The first category of evidence consisted of affidavits obtained in 1999 from the step-grandparents of the victim, Linda Jeffers and Ramsey Jeffers, as well as Cathy Jeffers, who is the sister of Kenneth Jeffers, the step-father of the victim.  In her affidavit, dated November 3, 1999, Cathy Jeffers asserted that she had observed the petitioner in April 1985 on approximately three or four occasions while he was residing at her parents' residence with her brother.  She stated the following in her affidavit:

---

[3] This testimony, although not included in the record on appeal in this case, was considered by the coram nobis court in its analysis of the petitioner's coram nobis claim.

[The petitioner] continuously mumbled to himself. I remember asking [the petitioner] what he was saying or to whom he was talking too [sic]. I distinctly remember that [the petitioner] told me that he was listening and talking to "a voice." He continued by commenting in a stern voice / firm conviction that "the only person that tells me what to do is the voice." I remember that he had a very strange look on his face when he told me about "the voice." Upon hearing this information, I purposely had no further conversations with [the petitioner] about this matter.

She also recounted the following in her affidavit:

I had slept at my parent's apartment during one evening in April, 1985, when [the petitioner] awoke at night, walked and mumbled through the apartment and woke me up to warn me that the police were in the apartment and that they were there to kill us with chainsaws. I told [the petitioner] that such was not the case and that he should go back to sleep.

Linda and Ramsey Jeffers asserted in their affidavits, also dated November 3, 1999, that they had observed the petitioner in April 1985 on several occasions while he was residing at their residence with their son. Both stated that the petitioner "repeatedly said that he did not believe in God" and that he had "repeatedly" told them that he talked every day and night "to the devil and that the devil and/or voices told him what to do." Linda and Ramsey Jeffers both stated that the petitioner had "repeatedly" told them that his "voices" would "tell him to kill people." Linda Jeffers described in her affidavit what she considered "evidence" of the petitioner's "voices" telling him to kill people:

I personally observed that [the petitioner] walked through our apartment and mumbled to himself. When I asked him what he was saying or to whom he was talking too [sic], he would answer by stating that he was listening and talking to his "voices."

Sometime immediately before April 15, 1985, I observed that [the petitioner] chased a young girl down Virginia Avenue, holding a machete, screaming that he was going to kill the child. He chased her to a nearby apartment where the child entered and fled for safety. When [the petitioner] returned to our apartment, I asked him what he was doing and why he chased the child with

-11-

a machete? To the best of my recall, he told me that he chased the child with a machete because he wanted to kill her because "I don't like her looks."

I distinctly recall that on several occasions, when I was in the company of [the petitioner] at our apartment, he would mumble to himself that he wanted to kill people. He would make these comments about total strangers that happened to walk past our apartment.

Ramsey Jeffers described in his affidavit what he considered "evidence" of the petitioner's "voices" telling him to kill people:

I personally observed that [the petitioner] walked through our apartment and mumbled to himself. When I asked him what he was saying or to whom he was talking too [sic], he would tell me that he was talking to his voices.

Sometime immediately before April 15, 1985, sometime at or before midnight, I stopped [the petitioner] in our apartment hallway as he walked mumbling to himself towards my son's bedroom with a long bladed machete in his hand. I asked him what he was doing to which he said, "I'm gonna kill Kenny." I was able to take the machete away from him and stopped him from hurting my son.

Sometime immediately before April 15, 1985, I observed that [the petitioner] chased a young girl down Virginia Avenue and he had the same previously mentioned machete in his hand. To the best of my knowledge, he chased her into a nearby apartment and screamed that he wanted to kill her. When I asked him what he was doing, to the best of my recall, [the petitioner] told me that he chased the young girl with the machete and wanted to kill her because "I don't like her looks."

I distinctly recall that on several occasions, when I was in the company of [the petitioner] at my apartment, he would mumble to himself and then comment that he wanted to kill people. He would make these comments about total strangers that happened to walk past my apartment.

-12-

All three of the Jeffers family members stated in their affidavits that they had never been contacted by anyone associated with the petitioner's case prior to speaking with the petitioner's attorneys in July 1999. Copies of the affidavits from the Jeffers family members were filed with the petitioner's coram nobis petition.

The second piece of evidence relied on in support of the coram nobis petition was an affidavit obtained in May 1999 from Inez M. Prigmore, one of the petitioner's former neighbors. In her affidavit, Ms. Prigmore stated that Clifford Irick, the petitioner's father, was "an excessive drinker and a brutal man." Ms. Prigmore explained that she had lived two doors from the Irick home when the petitioner was approximately 14 or 15 years old. Ms. Prigmore stated that Clifford Irick "could be heard swearing at his wife and children from the residence approximately one thousand feet away." Ms. Prigmore also stated that she "could also clearly hear the sounds of the children within the [Irick] house being hit." She said that she personally had "witnessed various incidents of violence at the Irick home" as well as bruises on the bodies of the petitioner, his sisters, and the petitioner's mother. A specific incident of violence described in the affidavit involved Clifford Irick's hitting one of his daughters, who was pregnant at the time, knocking her to the ground. Another incident described in the affidavit involved Clifford Irick's hitting the petitioner "in the back of the head with a large wooden object, which appeared to be a two by four." Ms. Prigmore stated in her affidavit that the petitioner had been "knocked to the ground" during the incident. She also recalled in her affidavit that she had heard the petitioner's father tell him when he was approximately 17 years of age "to leave the house and to never come back." A copy of Ms. Prigmore's affidavit was filed with the petitioner's coram nobis petition.

The third category of evidence relied on in support of the coram nobis petition consisted of an April 30, 2010 report prepared by Doctor Peter Brown, a forensic psychiatrist, as well as Doctor Brown's testimony offered at the August 16, 2010 hearing concerning the petitioner's competency to be executed. Neither Doctor Brown's report nor his competency hearing testimony were filed with the petitioner's coram nobis petition. Additionally, they were not filed as exhibits to the coram nobis hearing. The parties, however, agreed to allow the coram nobis court to consider Doctor Brown's 26-page written report, which was introduced into evidence at the hearing on the petitioner's competency to be executed, and the transcript of Doctor Brown's testimony from that same hearing. Because the parties to this appeal made no attempt to include this evidence within the record for this case, we have looked to the records of the appellate proceedings concerning both the denial of the petitioner's motion to reopen his post-conviction petition and his competency to be executed in order to consider the substance of Doctor Brown's report and testimony.

In his report, Doctor Brown reached the following conclusions to within a reasonable degree of medical certainty based upon his personal evaluation of the petitioner

and extensive review of documents provided by the petitioner's federal habeas corpus attorneys:

> 1. There is insufficient information to conclude that [the petitioner] was capable of forming specific intent in the commission of his offense, as defined by Tennessee statute. There is evidence of severe mental illness at the time of the offense and his sanity at the time cannot be established beyond a reasonable doubt.
>
> 2. Specifically, the weight of the available information indicates that [the petitioner], more likely than not, lacked substantial capacity either to appreciate the wrongfulness of his conduct or to conform that conduct to the requirements of the law due to a severe mental illness. It is more likely than not that he lacked substantial capacity to appreciate the wrongfulness of his acts.
>
> 3. Neuropsychological testing and developmental history indicate[s] that the [petitioner] has severe deficits in his capacity to premeditate, appreciate, make judgments or conform his behavior. It is more likely than not that these deficits have been present since childhood and have continued unchanged throughout his adult life. Test results are approximately consistent with those of a 7-9-year-old child. His severe impairments would have existed continuously from childhood and have been present both at the time of the offense and at the time of his trial and are present now.

The "severe mental illness" upon which Doctor Brown based his conclusions consisted of a combination of unspecified cognitive, psychotic, and personality disorders. Specifically, Doctor Brown diagnosed the petitioner as suffering from: a cognitive disorder, not otherwise specified; a psychotic disorder, not otherwise specified, that did not constitute schizophrenia, paranoid type; a paranoid personality disorder; and a schizoid personality disorder. Doctor Brown characterized the petitioner's unspecified psychotic disorder as a condition "for which there is inadequate information to make a specific diagnosis." Doctor Brown acknowledged in his report that "[a] more specific diagnosis cannot be made on the available information." Doctor Brown's conclusion that the petitioner suffered from an unspecified psychotic disorder at the time of the offense was based primarily upon the affidavits obtained in 1999 from the Jeffers family members.

In its opinion affirming the trial court's decision on the petitioner's competency to be executed, our supreme court summarized Doctor Brown's relevant findings and testimony from the hearing on that claim:

> [Doctor] Brown evaluated [the petitioner] on December 7, 2009, and January 21, 2010, meeting with [the petitioner] for almost six hours. In addition to his own meetings with [the petitioner], [Doctor] Brown also relied upon the neuropsychological testing and evaluation of [the petitioner] performed by [Doctor] D. Malcolm Spica, a licensed clinical psychologist and neuropsychologist, in November and December of 2009. Furthermore, [Doctor] Brown had reviewed [the petitioner's] school records, records from the various mental health facilities in which [the petitioner] had been institutionalized [as a child], records from the various mental health professionals who had treated and/or evaluated [the petitioner] during his life, portions of the transcripts and evidence offered at [the petitioner's] trial, portions of the proof introduced at the state post-conviction and federal habeas corpus proceedings, and records from the correctional facilities in which [the petitioner] has been incarcerated.
>
> [Doctor] Brown candidly testified that the purpose of his evaluation had been to determine [the petitioner's] mental status at the time of the murder and to identify any mitigating circumstances. . . . [Doctor] Brown testified that [the petitioner] has suffered from a lifelong severe psychiatric illness and that at the time of the offense he was suffering from psychosis. Through [Doctor] Brown, [the petitioner] introduced evidence concerning his past diagnoses of mental illness, evidence of his potentially violent actions during his teenage years, and evidence of his psychotic behavior around the time of the victim's murder.
>
> [Doctor] Brown diagnosed [the petitioner] as suffering from a psychotic disorder not otherwise specified. This psychotic disorder is a condition manifested by gross perceptual and thinking deficits, such as hallucinations, delusions, and gross disorganization of behavior. [Doctor] Brown believed that [the petitioner's] expressed inability to remember the offense

-15-

was genuine; he did not believe [the petitioner] was malingering or pretending to have lost his memory. [Doctor] Brown opined that [the petitioner's] inability to remember the offense is the result of the psychotic episode [the petitioner] was experiencing at the time of the offense. [Doctor] Brown explained that persons suffering psychoses typically do not have "good recollection" of events occurring during psychotic episodes. At the same time, [Doctor] Brown acknowledged that [the petitioner] is able to recall events from his childhood, from the evening of the murder, and from his trial. [Doctor] Brown also acknowledged that during psychological evaluations conducted not long after the crime, [the petitioner] admitted he had been drinking alcohol on the day of the offense and that he had felt "angry," "enraged," "degraded," and "humiliated" by the family's request for him to babysit the children because he had planned to go out that evening.

[Doctor] Brown opined that [the petitioner's] mental problems continue to the present time, although he agreed that [the petitioner] showed no evidence of thought disorder, acute hallucinations, or delusions during their interview. [Doctor] Brown's diagnosis was based on [the petitioner's] history; however, [Doctor] Brown acknowledged that there have been no documented episodes of psychosis during [the petitioner's] incarceration at the Riverbend Maximum Security Institution. [Doctor] Brown also acknowledged that [the petitioner] has responded well to the structured environment of prison and that he has not been prescribed anti-psychotic medication since adolescence. [Doctor] Brown opined that the "best examples" of [the petitioner's] psychotic behavior were contained in the lay affidavits provided by members of the [Jeffers] family in 1999 during federal habeas corpus proceedings. . . . [Doctor] Brown agreed that these affidavits constituted the most recent reports of any psychotic episodes.

[Doctor] Brown acknowledged that [the petitioner] denied having any memory of the events recounted in the affidavits and further denied having any psychological impairment. [Doctor] Brown explained that a person suffering from paranoia and psychosis has a tendency to minimize or deny

symptoms, meaning "the most reliable information" is typically the reports of third parties witnessing the symptoms. In [Doctor] Brown's view, all the data from [the petitioner's] childhood, including a report that at age six he expressed fear of his own impulses and felt threatened by those in his environment, were consistent with a severe psychiatric condition. [Doctor] Brown explained that psychotic symptoms tend to wax and wane according to circumstances, with emotional conflict serving as a trigger for a psychotic episode. [Doctor] Brown opined that the marital strife between the victim's mother and step-father at the time of the murder likely amounted to a trigger for [the petitioner's] p[sy]chosis.

[Doctor] Brown also diagnosed [the petitioner] as suffering from cognitive disorder not otherwise specified, a condition manifested by significant problems in the processing of information that does not meet the criteria for a specific diagnosis of a dementia, such as Alzheimer's, and that has no alternative explanation. This diagnosis was based upon the neuropsychological testing performed by [Doctor] Spica and was consistent with [the petitioner's] history. The neuropsychological testing indicated gross impairment in [the petitioner's] executive function, relating to his ability to integrate information from various processes in order to make decisions, to plan, and to control impulses. A person having this disorder, [Doctor] Brown explained, would not be able to resist paranoid delusions or command hallucinations. [Doctor] Brown further explained that this condition affects memory. [The petitioner] also has gross deficit in language function, [Doctor] Brown stated, meaning that his ability to use words as props to structure memory is impaired.

While [Doctor] Brown ruled out schizophrenia, he diagnosed [the petitioner] with paranoid and schizoid personality disorders. According to [Doctor] Brown, the paranoid personality disorder manifests itself in [the petitioner's] inability to evaluate people because of "his level of suspiciousness and his tendency to be looking for attacks, verbal, physical, whatever . . . from a variety of different places at different times." [Doctor] Brown testified that the schizoid

-17-

personality disorder manifests itself in [the petitioner's] "gross disorganization." [Doctor] Brown opined that it is "impossible to find a time in [the petitioner's] life when he was succeeding at meeting the goals and standards of his age group and that his primary way of coping" has been to withdraw from people.

Overall, [Doctor] Brown found evidence of two significant features based on his diagnoses of four psychological disorders. "One is a lifelong severe psychiatric illness and evidence of episodes from reliable reporters of some of the most severe and the most dangerous psychiatric symptoms." The second is the clear evidence of gross impairment of [the petitioner's] "ability to control, plan, and effectively execute or refrain from engaging in behavior with his cognitive disorder." Nevertheless, when [Doctor] Brown asked [the petitioner] about his general understanding of his present situation, [the petitioner] explained that he was on death row and expected to be executed. [The petitioner] expressed awareness of the offense he had committed and the victim's name, and he understood [Doctor] Brown's explanation of his own role and the reason [Doctor] Brown was examining [the petitioner] and preparing a report for the court.

*Irick III*, 320 S.W.3d at 288-90 (internal footnotes omitted).

The fourth category of evidence relied on in support of the coram nobis petition consisted of an affidavit obtained in February 2010 from Doctor Tennison, who had evaluated the petitioner prior to his trial and testified at the sentencing hearing on behalf of the State. A copy of Doctor Tennison's affidavit was not filed with the petitioner's coram nobis petition, nor was it exhibited at the coram nobis hearing or included in the record on appeal. Once again, because it is clear from the record that the parties agreed to allow the coram nobis trial court to consider the affidavit previously filed with the petitioner's motion to reopen his post-conviction petition in the context of this coram nobis proceeding, we have looked to the appellate record of that proceeding in order to review the substance of Doctor Tennison's affidavit.

In his affidavit, Doctor Tennison stated that the information contained within the Jeffers family affidavits raised "a serious and troubling issue" regarding whether the petitioner "was psychotic . . . on the date of the offense and at any previous or subsequent time." Doctor Tennison stated in his affidavit that the "historical information" contained

within the Jeffers affidavits "would have been essential to a determination of the role of a severe mental illness—a mental disease or defect—in [the petitioner's] ability to have appreciated the nature and wrongfulness of his behavior, and therefore to the formation of an opinion with regard to support for the insanity defense." Doctor Tennison opined in his affidavit that knowledge of the Jeffers affidavits "would have altered the course of the assessment" he conducted on the petitioner, "most likely resulting in a referral for inpatient completion of the court-ordered evaluation."

The fifth and final piece of evidence relied on in support of the coram nobis petition was the initial psychological assessment report by the Tennessee Department of Corrections (TDOC) dated December 12, 1986, a little more than a month after the petitioner was sentenced to death. A copy of this assessment was not filed with the petitioner's coram nobis petition, exhibited at the hearing, or included in the record on appeal. Once again, because it is clear from the record that the parties agreed to allow the coram nobis trial court to consider in the context of this coram nobis proceeding this piece of evidence previously filed with the petitioner's motion to reopen his post-conviction petition, we have looked to the appellate record of that proceeding order to review the substance of the TDOC psychological assessment. This one-page document states:

> The Peabody Picture Vocabulary Test indicates that the [petitioner] is functioning within the "borderline" range of intellectual abilities. [The petitioner] scored at the less than third grade level in the reading segment and at the beginning of the fifth grade level in the arithmetic segment of the revised WRAT. This inmate[']s Carlson Psychological Survey profile did not fit any of the type categories and has not yet been identified. He did, however, score at a very high level in the thought disturbance and self-depreciation scales. The thought disturbance scale reflects "disorganization of thinking, confusion, perceptual distortions and hallucinations, and feelings of unreality. These traits may manifest themselves in unusual affect, including anxiety. High scorers on this scale are indicating unusual problems in dealing with reality because they can not organize themselves or the work around them. They are emotionally upset, and may be moody, hypochondriacal, and miserable." The self-depreciation scale reflects "the degree to which the person degrades himself and his actions. The high scorer generally does not value himself and refuses credit for any accomplishment. This may be a characteristic personality trait for him or it may be a mood state, reflecting despondency,

depression and possible suicidal tendencies."

> During the interview, the [petitioner] appeared open, talkative and cooperative. He did, however, appear somewhat uncomfortable initially. He does not claim responsibility for the current offense, stating "my case is on appeal." He indicated that prior to his arrest he drank "quite a bit" and stated that he was arrested on on[c]e occasion in the past for public drunk. He indicated that he has used "all types of drugs" and reported that he has been drinking and using drugs since the age of six. He reported that around the "early sixties["] he was at Eastern State Mental Health Center because "my family couldn't control me due to violent outbursts." He stated that "I have problems with the dates" and "have experienced black outs in the past." Concerning his current adjustment to the institutional environment he stated "it's hard but if I stay to myself I do better." He reported approximately four suicide attempts in the past once by hanging and the other by cutting his wrist. He indicated that these occurred in the county jail and w[ere] due to the current offense. Concerning his current family relationship he stated "it's pretty good, we are on speaking terms." He indicated that while incarcerated he would like to obtain his GED.

In the memorandum of law that accompanied the coram nobis petition, the petitioner explained the significance of each category of evidence relied upon in the petition. With regard to the Jeffers affidavits, the petitioner argued that they provide firsthand accounts that, in the month immediately preceding the homicide, the petitioner was experiencing hallucinations, specifically command hallucinations, that caused him to act out in a bizarre and irrational manner. While acknowledging that "the issue of child abuse was raised by Nina Braswell-Lunn during the sentencing phase of [the petitioner's] trial," the petitioner argued to the coram nobis court that Ms. Prigmore's affidavit provides, for the first time, a firsthand account of the physical abuse inflicted upon the petitioner when he was a child. The petitioner argued that "[c]hild abuse has long been recognized as one of the principal causes of paranoid schizophrenia as well as other psychotic disorders."

In further support of the coram nobis petition, the petitioner filed affidavits, obtained in October 2010, from his court-appointed trial attorneys, Kenneth A. Miller and James H. Varner, as well as his court-appointed state post-conviction attorney, Douglas A. Trant, indicating that these attorneys had been unaware during their representation of the

-20-

petitioner of the evidence relied upon in support of the coram nobis petition. All three of these attorneys stated in their affidavits that they had used reasonable and due diligence in investigating the petitioner's mental state during their representation of him. In addition, the petitioner filed his own affidavit in support of the coram nobis petition stating that he had "no knowledge or memory of having done or experienced any of the things described" in the Jeffers or Prigmore affidavits.

In response to the petition, the State argued that the petition was time-barred because the petitioner had filed his claims outside the one-year limitations period applicable to coram nobis petitions and that principles of due process did not require a tolling of the limitations period. The State further argued that the new evidence relied upon in the petition, even if presented to the jury that convicted the petitioner and sentenced him to death, would not have resulted in the petitioner's acquittal by reason of insanity or in the jury's imposing a sentence other than death.

At the November 5, 2010 coram nobis hearing, the petitioner presented no additional evidence, relying only upon the evidence previously admitted in other hearings and the affidavits attached to the coram nobis petition. Following argument, the coram nobis court took the matter under advisement. Five days later, on November 10, the coram nobis court entered a written order denying coram nobis relief.[4] The coram nobis court found that although the offered evidence was later arising, the petitioner failed to raise his coram nobis claim in a timely manner within the limitations period. The court further found that due process did not require tolling of the one-year statute of limitations. Alternatively, the court found that even had the later-arising evidence been presented to the convicting and sentencing jury, the evidence would not have led to a different outcome at either phase of the

---

[4] On November 19, 2010, this court expedited the appeal of the denial of the coram nobis petition in order to protect the petitioner's right to due process of law and ensure meaningful appellate review prior to the scheduled execution date of December 7, 2010. On November 29, 2010, however, the supreme court stayed the petitioner's execution pending the outcome of declaratory judgment proceedings then pending in the Chancery Court for Davidson County, into which the petitioner had been granted leave to intervene, and which concerned the constitutionality of Tennessee's three-drug protocol for lethal injection. *See State v. Billy Ray Irick*, No. M1987-00131-SC-DPE-DD (Tenn. Nov. 29, 2010) (order). The stay of execution granted to the petitioner was ordered to remain in effect "throughout the pendency of any appeal of the trial court's final judgment in the declaratory judgment action and until the State files a motion to reset the execution date pursuant to Tennessee Supreme Court Rule 12.4." *Id*. at 2. In the briefs filed by the parties pursuant to the expedited briefing schedule set by the November 19, 2010 order of this court, neither party requested oral argument. Given the supreme court's order staying the petitioner's December 7, 2010 execution date, this case was docketed on briefs in this court on a non-expedited basis.

trial.[5]

On appeal, the petitioner contends that the coram nobis court erred by ruling that due process did not require that the statute of limitations be tolled and that the newly discovered evidence would not have resulted in a different outcome had it been presented at the trial and sentencing hearing. The petitioner also asserts for the first time on appeal that the State should be estopped from asserting the statute of limitations defense because the State failed to produce the 1988 TDOC mental health assessment contemporaneously to its occurrence. The State argues that the coram nobis court correctly denied relief because the petitioner's claims are not later-arising and because the petitioner's delay in presenting the claims was unreasonable as a matter of law.

*Application of Law*

A writ of error coram nobis is an "extraordinary procedural remedy," filling only a "slight gap into which few cases fall." *State v. Mixon*, 983 S.W.2d 661, 672 (Tenn. 1999) (citation omitted). Coram nobis relief is provided for in criminal cases by statute:

> The relief obtainable by this proceeding shall be confined to errors dehors the record and to matters that were not or could not have been litigated on the trial of the case, on a motion for a new trial, on appeal in the nature of a writ of error, on writ of error, or in a habeas corpus proceeding. Upon a showing by the defendant that the defendant was without fault in failing to present certain evidence at the proper time, a writ of error coram nobis will lie for subsequently or newly discovered evidence relating to matters which were litigated at the trial if the judge determines that such evidence may have resulted in a different judgment, had it been presented at the trial.

T.C.A. § 40-26-105(b) (2006); *see State v. Vasques,* 221 S.W.3d 514, 525-28 (Tenn. 2007) (describing standard of review as "'whether a reasonable basis exists for concluding that had the evidence been presented at trial, the result of the proceedings might have been different'"

---

[5]Although not expressed in the proper "might have" standard announced in *State v. Vasques*, 221 S.W.3d 514, 525-28 (Tenn. 2007), it is our view that the coram nobis court's formulation does not evince an application of the wrong standard. *See Kenneth Alan Steele v. State*, No. E2009-02376-CCA-R3-PC (Tenn. Crim. App., Knoxville, Mar. 10, 2011) (Witt, J., concurring) (observing that use of "would not have" could be said to "stat[e] the correct standard in the negative" but that "use of the Mixon-Vasques language would be preferable").

(citation omitted).

> The grounds for seeking a petition for writ of error coram nobis are not limited to specific categories, as are the grounds for reopening a post-conviction petition. Coram nobis claims may be based upon any "newly discovered evidence relating to matters litigated at the trial" so long as the petitioner also establishes that the petitioner was "without fault" in failing to present the evidence at the proper time. Coram nobis claims therefore are singularly fact-intensive. Unlike motions to reopen, coram nobis claims are not easily resolved on the face of the petition and often require a hearing.

*Harris v. State*, 102 S.W.3d 587, 592-93 (Tenn. 2003). The decision to grant or deny coram nobis relief rests within the sound discretion of the trial court. *Vasques*, 221 S.W.3d at 527-28.

"The writ of error [coram nobis] may be had within one (1) year after the judgment becomes final by petition presented to the judge at chambers or in open court, who may order it to operate as a supersedeas or not." T.C.A. § 27-7-103 (2000); *Mixon*, 983 S.W.2d at 670(holding that a petition for a writ of error coram nobis is untimely unless it is brought within one year of the entry of the trial court's "final," or last, order; the time for filing is not extended by the pursuit of a timely direct appeal). Principles of due process of law, however, may preclude the use of the statute of limitations to bar a claim in coram nobis. *Workman v. State*, 41 S.W.3d 100, 103 (Tenn. 2001). "'[B]efore a state may terminate a claim for failure to comply with procedural requirements such as statutes of limitations, due process requires that potential litigants be provided an opportunity for the presentation of claims at a meaningful time and in a meaningful manner.'" *Id.* at 102 (quoting *Burford v. State*, 845 S.W.2d 204 (Tenn. 1992)). Thus, principles of due process may intercede when, "under the circumstances of a particular case, application of the statute [of limitations] may not afford a reasonable opportunity to have the claimed issue heard and decided." *Burford*, 845 S.W.2d at 208. "Whether due process considerations require tolling of a statute of limitations is a mixed question of law and fact, which we review de novo with no presumption of correctness." *Harris v. State*, 301 S.W.3d 141, 145 (Tenn. 2010) (citing *Vaughn v. State*, 202 S.W.3d 106, 115 (Tenn. 2006)).

Initially, we note that the petitioner fails to cite authority to support his claim that the State is equitably estopped from presenting a statute of limitations defense to his petition for writ of error coram nobis. Therefore, the petitioner has waived this issue. Tenn. R. App. P. 27(a)(7) ("The brief of the appellant shall contain . . . [a]n argument . . . with

citations to the authorities and appropriate references to the record (which may be quoted verbatim) relied on. . . ."); Tenn. Ct. Crim. App. R. 10(b) ("Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court.").

A determination of whether due process principles require tolling the statute of limitations involves this court's weighing the petitioner's interest in having a hearing on a later-arising claim against the State's interest in preventing the litigation of stale claims. *Workman*, 41 S.W.3d at 103. In *Harris*, the Tennessee Supreme Court adopted a three-step analysis for balancing these interests:

> (1) determine when the limitations period would normally have begun to run;
>
> (2) determine whether the grounds for relief actually arose after the limitations period would have normally commenced; and
>
> (3) if the grounds for relief are "later-arising," determine if, under the facts of the case, a strict application of the limitations period would effectively deny the petitioner a reasonable opportunity to present the claim.

*Harris*, 301 S.W.3d at 145 (applying standards for tolling post-conviction claims announced in *Sands v. State*, 903 S.W.2d 297, 301 (Tenn. 1995)).

Applying the *Harris* factors to the present case, the limitations period would have begun to run 30 days after the entry of the order denying the petitioner's motion for new trial from his 1987 convictions. The statute of limitations would have expired in 1988. Clearly, the petition was untimely, filed 22 years later in 2010.

Next we must determine whether the grounds alleged in the coram nobis petition arose after the statute of limitations period had expired, or in other words, whether the grounds were later-arising. The petitioner asserts that the Prigmore and Jeffers affidavits were obtained in May and November 1999, respectively, during investigations concerning the petitioner's federal habeas corpus claims. Doctor Brown's report, which the petitioner asserts casts doubt on the mental health evidence presented at his original trial, took into consideration the Prigmore and Jeffers affidavits but was not obtained until April 2010. Doctor Tennison, the psychologist who evaluated the petitioner contemporaneously to his original trial, provided his affidavit in February 2010, and in it he asserted the significance of the Jeffers affidavits and the effect those affidavits would have had on his original

evaluation. The petitioner discovered the 1986 TDOC intake evaluation during the pendency of his federal habeas corpus proceedings. Accordingly, we conclude that the evidence offered by the petitioner and the grounds for relief resting thereon qualify as later-arising.

The final step of our due process analysis requires us to determine whether the petitioner was given a reasonable opportunity to present his claims. Prior to the supreme court's opinion in *Harris*, our courts had "declined to create a specific limitations period for later-arising claims . . . [or to] set an outer limit of reasonableness for delayed filings based on such claims." *Harris*, 301 S.W.3d at 146 (citation omitted). The supreme court, however, viewed the delay in *Harris*, over six years relative to some of the coram nobis claims, as "an opportunity to clarify when delay in seeking coram nobis relief may be unreasonable as a matter of law." *Id.* The court ultimately held that Harris' delay was unreasonable and sustained the State's affirmative defense of the statute of limitations.

In this case, the petitioner asserted that the litigation of his federal habeas corpus claims and related difficulties in obtaining additional mental health expert opinions prevented him from presenting his coram nobis claims in a more timely manner. It is clear, however, that the petitioner came to possess the Jeffers and Prigmore affidavits in 1999. That the petitioner was litigating related claims in either federal or state court did not preclude him from asserting these claims in a coram nobis petition as early as 1999 when the affidavits were first obtained. *See Harris*, 301 S.W.3d at 146. Indeed, the petitioner presented the substance of these claims in the hearings on his competency to be executed and motion to reopen his post-conviction petition in the months leading up to his coram nobis petition. *See also id.* at 147 (stating that Harris was on notice that he should file his coram nobis claim at the time of his motion to reopen post-conviction proceedings, yet he waited an additional 25 months before filing the petition for writ of error coram nobis). It was not until every other avenue of relief had been exhausted that the petitioner filed his coram nobis claim.[6] Accordingly, we conclude that the 11-year delay is unreasonable and that, as a matter of law, the petitioner is not entitled to due process tolling. Therefore, the petition is time-barred.

That being said, we also agree with the coram nobis court that had the claims been presented in a timely manner, the petitioner would nevertheless not be entitled to coram nobis relief. "As a general rule, subsequently or newly discovered evidence which is simply

---

[6] On September 16, 2010, this court, in denying the petitioner's appeal of his motion to reopen his post-conviction proceedings, noted that the evidence presented in the motion to reopen would be more aptly presented via a coram nobis petition. *Billy Ray Irick v. State*, No. E2010-01740-CCA-R28-PD, at 12 (Tenn. Crim. App., Knoxville, Sept. 16, 2010) (Order). Notably, the petitioner filed his coram nobis petition on October 14, 2010.

-25-

cumulative to other evidence in the record . . . will not justify the granting of a petition for the writ of error coram nobis when the evidence, if introduced," might not have resulted in a different outcome. *State v. Hart*, 911 S.W.2d 371, 375 (Tenn. Crim. App. 1995) (citations omitted); *see also Vasques*, 221 S.W.3d at 525-28 (noting that proper standard of review is whether the proffered evidence "might have" resulted in a different outcome rather than whether it "would have" resulted in a different one). The convicting and sentencing jury heard substantial evidence concerning the petitioner's mental health history. Ms. Braswell-Lunn testified in great detail regarding the petitioner's childhood mental health issues, various mental health diagnoses while a child, and general family circumstances. Her testimony at trial included the opinion that the petitioner may have suffered some abuse. Doctor Tennison's testimony before the convicting and sentencing jury included the petitioner's report of auditory hallucinations contemporaneous to the crimes. In contrast, the Jeffers and Prigmore affidavits, although arguably corroborating the petitioner's self-reports, did not actually add any information that had not already been presented during the petitioner's trial. To the extent that Doctor Brown's opinion concerning the petitioner's sanity at the time of the offenses may be deemed new, we note that his report and testimony repeatedly stated that there was inadequate information available upon which to make a definitive diagnosis regarding the petitioner's sanity or mental condition at the time of the offenses. Moreover, we note that although Doctor Brown opined that the petitioner would have been unable to form "specific intent," at the time of the offenses, both felony murder and aggravated rape were general intent crimes. *State v. Kimbrough*, 924 S.W.2d 888, 890 (Tenn. 1996); *Walden v. State*, 156 S.W.2d 385, 387 (Tenn. 1941); *State v. Howard*, 693 S.W.2d 365, 368 (Tenn. Crim. App. 1985); *State v. Holcomb*, 643 S.W.2d 336, 341 (Tenn. Crim. App. 1982). For all these reasons, we agree with the coram nobis court that the petitioner failed to establish that, had the later-arising evidence been admitted at the original trial, it might have changed the outcome.

*Conclusion*

Because due process considerations do not require a tolling of the statute of limitations under the circumstances presented in this case, the petition for writ of error coram nobis is time-barred. Furthermore, had it not been time-barred, we would agree with the coram nobis court that the petitioner failed to establish that admission of the proffered evidence might have resulted in a different outcome. For these reasons, the judgment of the coram nobis court is affirmed.

_____
JAMES CURWOOD WITT, JR., JUDGE